CHEROKEE NATION *v.* JOURNEYCAKE.

APPEAL FROM THE COURT OF CLAIMS.

No. 619. Argued and submitted October 18, 1894. — Decided November 19, 1894.

The Cherokees and the Delawares having, on the 8th day of April, 1867, in pursuance of the provisions of the treaty of July 19, 1866, 14 Stat. 799, between the United States and the Cherokee Nation, entered into a contract, whereby it was agreed that, on the fulfilment by the Delawares of the stipulations on their part contained in said contract, all the members of that tribe, registered as provided in said contract, should become members of the Cherokee Nation, with the same rights and immunities and the same participation (and no other) in the national funds as native Cherokees, except as otherwise provided in the contract, the so registered Delawares were on such fulfilment of their stipulations, thereby incorporated into the Cherokee Nation, and, as members and citizens thereof, were entitled to equal rights in the lands of that Nation and their proceeds.

On July 19, 1866, the United States and the Cherokee Nation entered into a treaty, 14 Stat. 799, 803, the fifteenth article of which is as follows:

" The United States may settle any civilized Indians, friendly with the Cherokees and adjacent tribes, within the Cherokee country, on unoccupied lands east of 96°, on such terms as may

be agreed upon by any such tribe and the Cherokees, subject to the approval of the President of the United States, which shall be consistent with the following provisions, viz.: Should any such tribe or band of Indians settling in said country abandon their tribal organization, there being first paid into the Cherokee national fund a sum of money which shall sustain the same proportion to the then existing national fund that the number of Indians sustain to the whole number of Cherokees then residing in the Cherokee country, they shall be incorporated into and ever after remain a part of the Cherokee nation, on equal terms in every respect with native citizens. And should any such tribe, thus settling in said country, decide to preserve their tribal organizations, and to maintain their tribal laws, customs, and usages, not inconsistent with the constitution and laws of the Cherokee Nation, they shall have a district of country set off for their use by metes and bounds equal to one hundred and sixty acres, if they should so decide, for each man, woman, and child of said tribe, and shall pay for the same into the national fund such price as may be agreed on by them and the Cherokee Nation, subject to the approval of the President of the United States, and in cases of disagreement the price to be fixed by the President.

"And the said tribe thus settled shall also pay into the national fund a sum of money, to be agreed on by the respective parties, not greater in proportion to the whole existing national fund and the probable proceeds of the lands herein ceded or authorized to be ceded or sold than their numbers bear to the whole number of Cherokees then residing in said country, and thence afterwards they shall enjoy all the rights of native Cherokees. But no Indians who have no tribal organizations, or who shall determine to abandon their tribal organizations, shall be permitted to settle east of the 96° of longitude without the consent of the Cherokee National Council, or of a delegation duly appointed by it, being first obtained. And no Indians who have and determine to preserve their tribal organizations shall be permitted to settle, as herein provided, east of the 96° of longitude without such consent being first obtained, unless the President of the United

States, after a full hearing of the objections offered by said council or delegation to such settlement, shall determine that the objections are insufficient, in which case he may authorize the settlement of such tribe east of the 96° of longitude."

Prior to that time, and in 1839, the Cherokee Nation had adopted a constitution, section 2 of article I and section 5 of article III being in these words:

"SEC. 2. The lands of the Cherokee Nation shall remain common property; but the improvements made thereon, and in the possession of the citizens of the Nation, are the exclusive and indefeasible property of the citizens respectively who made or may rightfully be in possession of them: *Provided*, That the citizens of the Nation possessing exclusive and indefeasible right to their improvements, as expressed in this article, shall possess no right or power to dispose of their improvements, in any manner whatever, to the United States, individual States, or to individual citizens thereof; and that, whenever any citizen shall remove with his effects out of the limits of this Nation, and become a citizen of any other government, all his rights and privileges as a citizen of this Nation shall cease: *Provided, nevertheless*, That the National Council shall have power to readmit, by law, to all the rights of citizenship, any such person or persons who may, at any time, desire to return to the Nation, on memorializing the National Council for such readmission."

"SEC. 5. No person shall be eligible to a seat in the National Council but a free Cherokee male citizen, who shall have attained to the age of twenty-five years.

"The descendants of Cherokee men by all free women, except the African race, whose parents may have been living together as man and wife, according to the customs and laws of this Nation, shall be entitled to all the rights and privileges of this Nation as well as the posterity of Cherokee women by all free men. No person who is of negro or mulatto parentage, either by the father's or the mother's side, shall be eligible to hold any office of profit, honor, or trust, under this government." (Const. and Laws, Cherokee Nation, ed. of 1892, pp. 11, 12, and 14.)

Immediately following the treaty the Cherokee Nation amended these sections, first adopting the following preamble:

"Whereas, by the treaty executed at Washington, on the 19th day of July, A.D. 1866, between the United States and the Cherokee Nation, through its delegation, ratified by the Senate and officially promulgated by the President of the United States, August 11, 1866, certain things were agreed to between the parties to said treaty, involving changes in the constitution of the Cherokee Nation, which changes cannot be accomplished by the usual mode; and,

"Whereas, it is the desire of the people and government of the Cherokee Nation, to carry out in good faith all of its obligations, to the end that law and order be preserved, and the institutions of their government maintained."

The sections, as amended, read as follows:

"SEC. 2. The lands of the Cherokee Nation shall remain common property until the National Council shall request the survey and allotment of the same, in accordance with the provisions of article 20th of the treaty of 19th July, 1866, between the United States and the Cherokee Nation."

"SEC. 5. No person shall be eligible to a seat in the National Council but a male citizen of the Cherokee Nation, who shall have attained to the age of twenty-five years, and who shall have been a *bona fide* resident of the district in which he may be elected, at least six months immediately preceding such election. All native-born Cherokees, all Indians, and whites legally members of the Nation by adoption, and all freedmen who have been liberated by voluntary act of their former owners or by law, as well as free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months from the 19th day of July, 1866, and their descendants, who reside within the limits of the Cherokee Nation, shall be taken and deemed to be citizens of the Cherokee Nation." (Constitution and Laws, Cherokee Nation, ed. 1892, pp. 31, 32, and 33.)

In pursuance of this treaty, and under this amended constitution, the Cherokees and Delawares came together and

entered into an agreement of date April 8, 1867, which, after referring to certain treaties, among them this of July 19, 1866, and reciting that a "full and free conference 'has been had between the representatives of the Cherokees and the Delawares, in view of the treaties herein referred to, looking to a location of the Delawares upon the Cherokee lands, and their consolidation with said Cherokee Nation," stipulates as follows:

"Now, therefore, it is agreed between the parties hereto, subject to the approval of the President of the United States, as follows:

"The Cherokees, parties of the first part, for and in consideration of certain payments, and the fulfilment of certain conditions hereinafter mentioned, agree to sell to the Delawares, for their occupancy, a quantity of land east of the line of the 96° west longitude, in the aggregate equal to one hundred and sixty acres for each individual of the Delaware tribe, who has been enrolled upon a certain register made February 18, 1867, by the Delaware agent, and on file in the Office of Indian Affairs, being the list of Delawares who elect to remove to the 'Indian country,' to which list may be added, only with the consent of the Delaware council, the names of such other Delawares as may, within one month after the signing of this agreement, desire to be added thereto, and the selections of the lands to be purchased by the Delawares may be made by said Delawares in any part of the Cherokee Reservation east of said line of 96°, not already selected and in possession of other parties, and in case the Cherokee lands shall hereafter be allotted among the members of said Nation, it is agreed that the aggregate amount of land herein provided for the Delawares, to include their improvements according to the legal subdivisions when surveys are made, (that is to say, one hundred and sixty acres for each individual,) shall be guaranteed to each Delaware incorporated by these articles into the Cherokee Nation, nor shall the continued ownership and occupancy of said land by any Delaware so registered be interfered with in any manner whatever without his consent, but shall be subject to the same conditions and restrictions as are

by the laws of the Cherokee Nation imposed upon native citizens thereof.

"Provided that nothing herein shall confer the right to alienate, convey, or dispose of any such lands, except in accordance with the constitution and laws of said Cherokee Nation.

"And the said Delawares, parties of the second part, agree that there shall be paid to the said Cherokees from the Delaware funds now held or hereafter received by the United States, a sum of money equal to one dollar per acre for the whole amount of one hundred and sixty acres of land for every individual Delaware who has already been registered upon the aforesaid list, made February 18, 1867, with the additions theretofore provided for.

"And the Secretary of the Interior is authorized and requested to sell any United States stocks belonging to the Delawares to procure funds necessary to pay for said lands; but in case he shall not feel authorized, under existing treaties, to sell such bonds belonging to the Delawares, it is agreed that he may transfer such United States bonds to the Cherokee Nation, at their market value, at the date of such transfer.

"And the said Delawares further agree, that there shall be paid from their funds, now or hereafter to come into possession of the United States, a sum of money which shall sustain the same proportion to the existing Cherokee national fund that the number of Delawares registered as above mentioned and removing to the Indian country sustains to the whole number of Cherokees residing in the Cherokee Nation. And for the purpose of ascertaining such relative numbers, the registers of the Delawares herein referred to, with such additions as may be made within one month from the signing of this agreement, shall be the basis of calculation as to the Delawares, and an accurate census of the Cherokees residing in the Cherokee Nation shall be taken under the laws of that Nation within four months, and properly certified copies thereof filed in the Office of Indian Affairs, which shall be the basis of calculation as to the Cherokees.

"And that there may be no doubt hereafter as to the

amount to be contributed to the Cherokee national fund by the Delawares, it is hereby agreed by the parties hereto that the whole amount of the invested funds of the Cherokees, after deducting all just claims thereon, is $678,000.

"And the Delawares further agree, that in calculating the total amount of said national fund there shall be added to the said sum of $678,000 the sum of $1,000,000, being the estimated value of the Cherokee neutral lands in Kansas, thus making the whole Cherokee national fund $1,678,000; and this last-mentioned sum shall be taken as the basis for calculating the amount which the Delawares are to pay into the common fund.

"Provided, that as the $678,000 of funds now on hand belonging to the Cherokees is chiefly composed of stocks of different values, the Secretary of the Interior may transfer from the Delawares to the Cherokees a proper proportion of the stocks now owned by the Delawares of like grade and value, which transfer shall be in part of the *pro rata* contribution herein provided for by the Delawares to the funds of the Cherokee Nation; but the balance of the *pro rata* contribution by the Delawares to said fund shall be in cash or United States bonds, at their market value.

"All cash, and all proceeds of stocks, whenever the same may fall due or be sold, received by the Cherokees from the Delawares under the agreement, shall be invested and applied in accordance with the 23d article of the treaty with the Cherokees of August 11, 1866.

"On the fulfilment by the Delawares of the foregoing stipulations, all the members of the tribe registered as above provided, shall become members of the Cherokee Nation, with the same rights and immunities, and the same participation (and no other) in the national funds as native Cherokees, save as hereinbefore provided.

"And the children hereafter born of such Delawares so incorporated into the Cherokee Nation, shall in all respects be regarded as native Cherokees."

In pursuance of this agreement, which was approved by the President of the United States as stipulated in article XV of the treaty, 985 Delawares removed to the territory of the

Cherokees, paid $157,600 for the lands set apart for them, contributed $121,824.28, their share of the national fund as provided, and became incorporated into the Cherokee Nation.

At the time of this treaty the Cherokee Nation was possessed of the following tracts or bodies of lands:

|  | ACRES. |
|---|---|
| "Strip" lands in Kansas (about) | 400,000 |
| "Neutral" lands in Kansas (about) | 1,000,000 |
| Lands west of 96°, Indian Territory (about) | 8,000,000 |
| Lands east of 96°, Indian Territory, Home Reservation (about) | 5,000,000 |

By article XVII of the treaty the strip lands and the neutral lands were ceded to the United States, to be sold for the benefit of the Cherokee Nation. The sum expected to be realized from the sale of the neutral lands was, by the agreement between the Cherokees and the Delawares, considered as already received and a part of the Cherokee national fund. The proceeds of the sale of the strip lands were subsequently appropriated to the uses of the Cherokee Nation as a Nation, and not for the benefit of the native Cherokees alone, leaving as still the property of the Cherokee Nation the two bodies of land in the Indian Territory (sometimes known as the "Home Reservation" and the "Cherokee Outlet"). Certain sums of money were received by the Cherokee Nation for the rental of the Cherokee outlet. These sums the Cherokee Council determined belonged wholly to the native Cherokees, to the exclusion of the Delawares. This brought about a controversy between the native Cherokees and the Delawares, involving not merely the right to share in these proceeds, but also the interest of the Delawares in the reservation and the outlet. On October 1, 1890, 26 Stat. 636, c. 1249, an act of Congress was passed providing for a reference to the Court of Claims of that controversy. Thereupon, on October 29, 1890, this suit was brought, the United States being made a party defendant, not as having any adverse interest, but as trustee, holding the funds of the Indians. The opinion of that court was filed April 24, 1893, 28 C. Cl. 281, the conclusion being that the

Delawares were incorporated into the Cherokee Nation, and, as members and citizens thereof, were entitled to equal rights in these lands and their proceeds. On May 22, 1893, a decree was entered in accordance with these views, from which decree the Cherokee Nation and the United States appealed to the court.

*Mr. Assistant Attorney General Dodge* for the United States, appellants, submitted on his brief.

*Mr. Charles A. Maxwell* and *Mr. George S. Chase* for the Cherokee Nation, appellants, submitted on their brief.

*Mr. J. H. McGowan*, (with whom was *Mr. Thomas C. Fletcher* on the brief,) for appellee.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

This case hinges on the status of the individual Delawares as members and citizens of the Cherokee Nation, and the rights secured to them by the agreement of April 8, 1867. In order to a correct understanding of this agreement it is necessary to refer to the provisions of article XV of the treaty of 1866. That article contemplated the settlement of other Indians within the limits of the Cherokee country east of the ninety-sixth degree of longitude, and provided for such settlement in two ways: one, in which the Indians settled should abandon their tribal organization, in which case, as expressed, they were to " be incorporated into and ever after remain a part of the Cherokee Nation on equal terms in every respect with native citizens." The other was where the removal of the tribe to the Cherokee country should involve no abandonment of the tribal organization, in which case a distinct territory was to be set off, by metes and bounds, to the tribe removed. The one contemplated an absorption of individual Indians into the Cherokee Nation; the other a mere location of a tribe within the limits of the Cherokee reservation. If the removed Indians were to be absorbed into the

Cherokee Nation, they were to be absorbed on equal terms in every respect with native citizens.

In this connection reference may be had to article XVI of the treaty, which authorized the government to settle friendly Indians in any part of the Cherokee country west of the ninety-sixth degree of longitude. This article differs from article XV in that it contemplated a location of any friendly tribe as a tribe, authorized the government to place it anywhere within the reservation west of the ninety-sixth degree of longitude, on a tract in compact form, and provided for a conveyance of such tract in fee simple to the located tribe. It thus provided for taking a body of land out of this part of the Cherokee reservation and removing it wholly from the jurisdiction of the Cherokee Nation, making a new reservation for the occupancy of the tribe to whom it was conveyed; while in the case of Indians removed under the provisions of article XV, even though the tribal organization was preserved, the general jurisdiction of the Cherokee Nation over the territory occupied by the removed tribe was not disturbed.

Turning now to the agreement itself, its purpose, as expressed in its preliminary language, was " a location of the Delawares upon the Cherokee lands and their consolidation with the said Cherokee Nation." There is no provision for the setting apart of a distinct body of land in any portion of the reservation for the Delaware tribe, but the agreement is to sell to them for their occupancy a quantity of land equal in the aggregate to 160 acres for each individual Delaware, who may " elect to remove to the Indian country," and " the selection of the amounts to be purchased by the Delawares may be made by said Delawares in any part of the said Cherokee Nation east of said line of 96 degrees, not already selected and in possession of other parties." This contemplates personal selection of separate tracts by individual Delawares. Further, there is a guarantee " to each Delaware incorporated by these articles into the Cherokee Nation " of the lands thus by him purchased, and that his ownership and occupancy shall not be interfered with in any manner without his consent — not the consent of the Delaware tribe — and also that it shall be sub-

ject to the " same conditions and restrictions as are by the laws of the Cherokee Nation imposed upon native citizens thereof." But we are not limited to the plain inferences to be drawn from these expressions. The positive provision at the close of the agreement is as follows:

" On the fulfilment by the Delawares of the foregoing stipulations, all the members of the tribe, registered as above provided, shall become members of the Cherokee Nation, with the same rights and immunities, and the same participations (and no other) in the national funds as native Cherokees, save as hereinbefore provided.

" And the children hereafter born of such Delawares so incorporated into the Cherokee Nation, shall in all respects be regarded as native Cherokees."

If nothing were presented other than the language of the agreement, the conclusion would seem irresistible that the registered Delawares, that is, those of the tribe who chose to remove from Kansas to the Indian Territory, were not only to become members of the Cherokee Nation, but also to stand equal with the native Cherokees in all the rights springing out of citizenship in the Cherokee Nation. Whatever rights the Cherokees had, the registered Delawares were to have, and it was an equality not limited to the living Delawares; but to guard against any misconception there was the express declaration that the children of the registered Delawares should in all respects be regarded as native-born Cherokees. This last clause was not inserted with the view of giving additional rights to such children, but to prevent any question as to their inheritance of all the rights which their fathers received under the agreement.

That the thirteen millions of acres, whether appropriately styled its "common property" or its "public domain," belonged to the Cherokee Nation as a nation, is beyond dispute. By the treaty of May 6, 1828, 7 Stat. 311, it was provided in article 2 that " the United States agree to possess the Cherokees, and to guarantee it to them forever, and that guarantee is hereby solemnly pledged, of seven millions of acres of land, to be bounded as follows: . . . In addition to the seven

million of acres thus provided for, and bounded, the United States further guarantee to the Cherokee Nation a perpetual outlet, West, and a free and unmolested use of all the country lying West of the Western boundary of the above described limits, and as far West as the sovereignty of the United States, and their right of soil extend."

By subsequent treaties, of February 14, 1833, 7 Stat. 414, and December 29, 1835, 7 Stat. 478, certain changes were made in the boundaries of the reservation and the outlet, and by article 3 of the latter treaty it was provided that "the United States also agree that the lands above ceded by the treaty of February 14, 1833, including the outlet, and those ceded by this treaty shall all be included in one patent executed to the Cherokee Nation of Indians by the President of the United States according to the provisions of the act of May 28, 1830."

Under these treaties, and in December, 1838, a patent was issued to the Cherokees for these lands. By that patent, whatever of title was conveyed was conveyed to the Cherokees as a nation, and no title was vested in severalty in the Cherokees, or any of them. The constitution of the Cherokee Nation, both as originally adopted in 1839 and as amended in 1866, declares in article 1, section 2, that "the lands of the Cherokee Nation shall remain common property," and while the amendment contemplates a time at which these lands shall cease to be common property, it is only when, by article 20 of the treaty of 1866, the National Council shall request that they be surveyed and allotted in severalty to the Cherokees. Not only does the Cherokee constitution thus provide that the lands shall be common property, but also the legislation of the Cherokee Nation from 1839 on to the present time abounds with acts speaking of these lands as "public domain" or "common property" of the Cherokee Nation. Quite a number of these acts are collected in the opinion of the Court of Claims in this case.[1]

---

[1] *Extract from the opinion of the Court of Claims.*

"The constitution and laws of the Cherokees, since that people came within the confines of civilization, have followed, in a limited extent, the

Now, if these lands be the public domain, the common property of the Cherokee Nation, all who are recognized as

---

traditions and usages of the race, and have embodied in them in varying degrees the fundamental principle and characteristics of communal property.

" The preamble of their constitution, September 6, 1839, like that of the Constitution of the United States, sets forth the general purpose of the instrument:

"'We, the people of the Cherokee Nation, in national convention assembled, in order to establish justice, insure tranquillity, promote the common welfare, and to secure to ourselves and our posterity the blessings of freedom — acknowledging with humility and gratitude, the goodness of the Sovereign Ruler of the Universe, in permitting us so to do, and imploring His aid and guidance in its accomplishment — do ordain and establish this constitution for the government of the Cherokee Nation.'

" The constitution then takes up (and it is most significant that it does so by its first article) the subject of paramount importance in the Indian mind — of more importance than the form of government, than the right of representation, than the right of trial by jury, or of habeas corpus, or of any of those principles of civil liberty, which, in the Anglo-Saxon mind are held supreme, the subject of their lands : ·

"' SEC. 2. The lands of the Cherokee Nation shall remain common property ; but the improvements made thereon, and in the possession of the citizens of the nation, are the· exclusive and indefeasible property of the citizens respectively who made, or may rightfully be in possession of them: Provided, that the citizens of the nation possessing exclusive and indefeasible right to their improvements, as expressed in this article, shall possess no right or power to dispose of their improvements in any manner whatever, to the United States, individual States, or to individual citizens thereof·; and that, whenever any citizen shall remove with his effects out of the limits of this nation, and become a citizen of any other government, all his rights and privileges as a citizen of this nation shall cease: Provided, nevertheless, that the national council shall have power to readmit, by law, to all the rights of citizenship, any such person or persons who may, at any time, desire to return to the nation, on memorializing· the national council for such readmission.

"' Moreover, the national council shall have power to adopt such laws and regulations, as its wisdom may deem expedient and proper, to prevent citizens from monopolizing improvements with the view of speculation.'

" The amendment of 1866 modified the foregoing as follows:

"' SEC. 2. The lands of the Cherokee Nation shall remain common property until the national council shall request the survey and allotment of the same, in accordance with the provisions of article 20th of the treaty of 19th of July, 1866, between the United States and the Cherokee Nation.'

" With these restrictive provisions should be considered the brief grant which the constitution contains of legislative power:

members and citizens of that Nation are alike interested and alike entitled to share in the profits and proceeds thereof.

---

" ' SEC. 14. The national council shall have power to make all laws and regulations which they shall deem necessary and proper for the good of the nation, which shall not be contrary to this constitution.'

" 'The legislation of the Cherokées recognizes again and again the communal character of the seizin or occupancy of the land. It is not ' lawful for any citizen of the Cherokee Nation to sell any farm or other improvement in said nation to any person other than a " bona fide " citizen thereof ; ' nor ' to rent any farm or other improvement to any other person than a citizen of the Indian Territory.' Revised Code, 1874, Art. xxi, sec. 112, p. 234. 'No person shall be permitted to settle or erect any improvement within one-fourth of a mile of the house, field, or other improvement of another citizen without his, her, or their consent, under the penalty of forfeiting such improvement and labor for the benefit of the original settler; provided, it may be lawful, however, where a settler has a field one-half mile or more from his residence, and where there may be a spring or running water and timber, for another citizen to improve and settle one hundred yards from such field so situated.' Act 24th September, 1839; *id.*, p. 249.

" The law regulating intermarriage with white men or foreigners provides that should a citizen of the United States or any foreign country ' become a citizen of the Cherokee Nation by intermarriage ' and be left a widower, he shall continue to enjoy the rights of citizenship unless he shall marry a person ' having no rights of Cherokee citizenship by blood; in that case, all of his rights acquired under the provisions of this act 'shall cease.' Revised Code, 1874, Art. xv, sec. 74, p. 223. If he abandons his wife, he ' shall thereby forfeit every right and privilege of citizenship,' and shall ' be removed from the nation.' Sec. 75. There is also a significant provision attached to the law allowing citizenship by intermarriage which shows how clearly the communal character of the property of the nation is recognized, that is to say, property of which all the citizens of the nation are joint owners and in which each has a direct personal interest :

" ' *Provided, also,* That the rights and privileges herein conferred shall not extend to right of soil or interest in the vested funds of this nation, unless such adopted citizen shall pay into the general fund of the national treasury a sum of money to be ascertained and fixed by the national council equal to the " pro rata " share of each native Cherokee, in the lands and vested wealth of the nation, estimated at five hundred dollars,' (*id.*, p. 224).

\* \* \* \* \* \* \*

" Herbert Spencer has said, Did primitive communal ownership survive, there would survive the primitive control of the uses to be made of land.' The Man *versus* The State, p. 386, ed. 1892. In the Cherokee county the converse of this is the condition of affairs. ' The primitive control of the uses to be made of land' has passed from the communal owners and

Given, therefore, the two propositions that the lands are the
common property of the Cherokee Nation, and that the reg-

---

become lodged in the State — that is to say, in the government of the nation
—and the communal owners as such exercise no more control over the
national territory than the citizens of the United States exercise over the
public lands of the United States.   Of this the statutes of the Cherokees
afford overwhelming evidence.

" The constitution, as before quoted, recognizes a right of 'occupancy
under the name of 'improvements' as ' an exclusive and indefeasible prop-
erty' in citizens rightfully in possession, but at the same time expressly
vests in the National Council 'power to adopt such laws and regulations
as its wisdom may deem expedient and proper to prevent citizens from
monopolizing improvements [*i.e.* occupancy] with the view of speculation.'
A statute contemporaneous with the constitution is entitled ' An act regu-
lating settlements on the *public domain.*'   Act September 24, 1839, Laws of
the Cherokee Nation, ed. 1875, p. 249.   A statute for the preservation of
trees refers to trees ' standing and growing upon the public domain' (*id.*,
p. 143, § 67).   The act 14th December, 1870 (*id.*, p. 252), declares the condi-
tions upon which railroad ties and other material shall ' be furnished from
the public domain.'   The Act 17th December, 1869 (*id.*, p. 255), is entitled
' An act for the protection of the public domain,' and the act 14th Decem-
ber, 1870 (*id.*, p. 257), ' An act in relation to the Public Domain.'

" All of these statutes and many others justify by their provisions the
use of the term ' Public Domain.'   A statute relating to minerals declares
that 'All gold, silver, lead, copper, iron, stone, coal, petroleum, salt, or
medicinal water' which has been or may be discovered within the limits of
the country ' is the property of the Cherokee Nation,' and provides for the
leasing of mines, petroleum beds, salt-works, and of mineral springs (*id.*,
p. 226).   The act regulating settlements on the public domain declares that
if they be left unoccupied they shall ' revert to the nation as common prop-
erty' (*id.*, p. 249).   The statute for the preservation of trees makes it a
misdemeanor to cut down, kill, or destroy any fruit or nut-bearing tree
' standing and growing upon the public domain of the Cherokee Nation.'
(*id.*, p. 143).   The act relating to railroad ties imposes a royalty to be paid
for taking timber from the public domain or stone from the quarries of the
nation (*id.*, p. 252).   The act for the protection of the public domain re-
quires a citizen to take out a license before he can dispose of sawed lumber,
and to pay into the treasury fifteen per cent of the money he receives for it
(*id.*, p. 255).   The act in relation to the public domain provides that at each
and every station along the line of any railroad passing through ' the lands
of the Cherokee Nation there shall be reserved to the Cherokee Nation one
mile square,' and that these tracts so reserved ' shall be laid off into town
lots and sold at public sale to the highest bidder,' who shall acquire thereby
no other rights ' than those of use and occupancy,' ' provided that this act
shall not be so construed as to interfere with any of the mineral resources

istered Delawares have become incorporated into the Cherokee Nation and are members and citizens thereof, it follows necessarily that they are equally with the native Cherokees the owners of and entitled to share in the profits and proceeds of these lands.

As against this conclusion the argument of the counsel for the Cherokees runs along these lines: First, that the terms "rights and immunities" refer only to political rights and immunities, and do not include property rights; second, that as it is specifically provided that the registered Delawares shall have equal participation in the national funds, while no

---

of the public domain' (*id.*, p. 257). The act for the support and education of orphan children empowers the trustees ' to occupy and hold as much land, not exceeding two miles square, as they may deem necessary for farming and mechanical purposes ' (*id.*, p. 258). The act authorizing the transfer or sale of Cherokee lands west of the Arkansas authorizes the sale of 'all the Cherokee lands,' ' commonly known as the Cherokee Outlet.' The act 19th May, 1883, recognizes ' the unoccupied lands belonging to the Cherokee Nation' as having been set apart by a previous statute ' to produce revenue from grazing,' and authorizes and directs the principal chief ' to execute a lease for all the unoccupied lands of the Cherokee Nation' west of the Arkansas. And other statutes and treaties have recognized and exercised the power of absolute sale and alienation without authority from or ratification by communal owners.

" With this power of regulation and control of the public domain and the *jus disponendi* lodged in the government of the Nation, it is plain that the communal element has been reduced to a minimum and exists only in the occupied lands. And it is manifest that with the growth of civilization, with all of its intricacies, and manifold requirements, the communal management of the public domain would have been utterly insufficient, and if it had continued would have been a barrier to the advancement of civilization itself.

" With these powers of absolute ownership lodged in the Cherokee government, the power to alienate, the power to lease, the power to grant rights of occupancy, the power to restrict rights of occupancy, and with the exercise of those powers running back to the very year of the adoption of the constitution, and receiving from that time to the present the unquestioning acquiescence of the former communal owners, the Cherokee people, it is apparent that the ' public domain' of the Cherokee Nation is analogous to the ' public lands' of the United States or the ' demesne lands of the Crown,' and that it is held absolutely by the Cherokee government, as all public property is held, a trust for governmental purposes and to promote the general welfare."

mention is made of these lands which constituted the bulk of the Cherokee property, it is to be taken that no interest therein was intended to be transferred; third, that this is strengthened by the fact that there was a stipulation for the purchase of certain lands at one dollar per acre; and, fourth, that the contribution of the Delawares to the national property was so small, and the value of these lands so great, that it could not have been in the contemplation of the parties that the Delawares were to receive any interest in them.

Commenting generally upon this line of argument, it is rather an endeavor to induce the court to reconstruct the contract and frame one more in accord with what, from the present standpoint, would seem to have been equitable, than to interpret the contract which the parties made, in accordance with the plain import of the language which they used.

It is true that "rights and immunities" are often used as descriptive of only political rights and immunities, and do not necessarily include property rights, so that if these were the only words by which the intent of the contracting parties was to be determined, there would be room for the argument that only political rights and immunities were intended to be granted. But it must be borne in mind that the rights and interest which the native Cherokees had in the reservation and outlet sprang solely from citizenship in the Cherokee Nation, and that the grant of equal rights as members of the Cherokee Nation naturally carried with it the grant of all rights springing from citizenship. So far as the provision in the agreement for the purchase of homes is concerned, it will be perceived that no absolute title to these homes was granted. We may take notice of the fact that the Cherokees in their long occupation of this reservation had generally secured homes for themselves; that the laws of the Cherokee Nation provided for the appropriation by the several Cherokees of lands for personal occupation, and that this purchase by the Delawares was with the view of securing to the individual Delawares the like homes; that the lands thus purchased and paid for still remained a part of the Cherokee reservation. And as a further consideration for the payment of this sum

for the purchase of homes the Delawares were guaranteed not merely the continued occupancy thereof, but also that in case of a subsequent allotment in severalty of the entire body of lands among the members of the Cherokee Nation, they should receive an aggregate amount equal to that which they had purchased, and such a distribution as would secure to them the homes upon which they had settled, together with their improvements. So that if, when the allotment was made, there was for any reason not land enough to secure to each member of the Cherokee Nation 160 acres, the Delawares were to have at least that amount, and the deficiency would have to be borne by the native Cherokees *pro rata.* In other words, there was no purchase of a distinct body of lands, as in the case of the settlement of other tribes as tribes within the limits of the Cherokee reservation. The individual Delawares took their homes in and remaining in the Cherokee reservation, and as lands to be considered in any subsequent allotment in severalty among the members of the Cherokee Nation. All this was in the line of the expressed thought of a consolidation of these Delawares with and absorption of them into the Cherokee Nation as individual members thereof. If it be said that all of the Delaware trust funds were not turned into the national fund it will be remembered that there was no impropriety in the reservation of a part thereof in order to enable the Delawares to make such improvements as they might desire on the tracts that they selected for homes, and also that there was no certainty that all the members of the Delaware tribe would elect to remove to the Cherokee country, and that those who remained in Kansas were entitled to their share in the Delaware national funds.

With regard to the claim that the Delawares paid an inconsiderable sum, if it was the intent that they should share equally with the native Cherokees in this vast body of lands included in the reservation and outlet, it will be borne in mind that the alleged gross inadequacy depends largely upon the value of these thirteen millions of acres. Counsel for the Cherokees place this value at $1.25 per acre — the minimum price for government lands — and upon that valuation base

their claim of inadequacy of consideration. They point to the fact that the neutral lands in Kansas were estimated in the agreement to be worth $1.25 an acre, and infer therefrom that the lands in the Indian Territory were of like value. But that is a mere inference, and over against it may be placed such facts as these: On June 14, 1866, only about a year before this agreement,.the Creeks, by treaty, sold to the government a tract in the Indian Territory estimated to contain 3,250,560 acres, at the price of 30 cents per acre. 14 Stat. 785, 786. The Seminoles, on March 21, 1866, likewise ceded a tract estimated at 2,169,080 acres, at the rate of 15 cents an acre, (14 Stat. 756,) and on April 28, 1866, the Chocktaws and Chickasaws ceded a large tract, also in the Territory, for the gross sum of $300,000 — a sum which, as counsel for the appellees stated, was only at the rate of about 5 cents an acre. .14 Stat. 769. The significance of these figures is not destroyed by the fact that in 1889 Congress appropriated a large sum for both the Creeks and Seminoles, to wit: to the Creeks the sum of $2,280,857.10, and to the Seminoles the sum of $1,912,942.02, 25 Stat. c. 317, 757, 758; c. 412, 980, 1004, apparently in further payment of these lands. For while this may tend to show that Congress then felt that the Creeks and Seminoles had not received a full price for their lands, it is not inconsistent with the claim that in 1866 the contracting parties considered the lands to be worth only the stipulated price. Further than that, in pursuance of the provisions of the fifth section of the act of May 29, 1872, c. 233, 17 Stat. 165, 190, an appraisement was made of the Cherokee lands west of the 96th meridian, which appraisement, approved by the President, fixed the value of a portion of such lands (230,014.04 acres) at 70 cents, and the balance (6,344,562.01 acres) at 47.49 cents per acre. It may well be that lands within the limits of a rapidly growing State were worth at the time of this agreement $1.25 per acre, while lands within the Indian Territory, situate as these were, were of much less value. Neither should too much weight be given to the fact that the Delawares were to pay for their homes at the rate of a dollar an acre, for by that purchase they acquired no title

in fee simple, and it is not unreasonable to believe that the price thus fixed was not merely as compensation for the value of the lands, (to be taken in the eastern portion of the reservation, where the body of the Cherokees had their homes, and therefore probably the most valuable portion of the entire reservation,) but also as sufficient compensation for an interest in the entire body of lands, that interest being like that of the native Cherokees limited to a mere occupancy of the tracts set apart for homes, with the right to free use in common of the unoccupied portion of the reserve, and a right to share in any future allotment. At any rate, with the uncertainty that exists as to its value, it cannot be said to be clear that there was such gross inadequacy of consideration as is urged by the counsel for the Cherokees; certainly nothing which would justify a court of equity in setting aside the contract on the ground of inadequacy.

But further, the thought of sale — at least of an early sale — was evidently not in contemplation of the parties, or in line with the then policy of the government. This Indian Territory was looked upon as the permanent home of the Indians. The government was making the effort to bring within its limits all the Indians from all parts of the land, and it was not in the contemplation of the government, or of these contracting parties, that at any early day these lands would be thrown open to settlement and sale, but rather the idea was that they were to be continued as their permanent place of abode. Considered as such, so long as each individual Indian, whether Delaware or Cherokee, had his particular tract for occupancy as a home, it was not unnatural or unequal that the vast body of the lands not thus specifically and personally appropriated should be treated as the common property of the Nation, in respect to which all who were members thereof, whether by birth or adoption, should be entitled to equal rights and privileges. That there might come a time when an allotment in severalty would be advisable, was something that was contemplated and provided for. And while, if allotment had been made at the time among the 13,573 Cherokees there would have been enough land to have given each nearly 1000 acres,

yet, with the expected coming in of other tribes, either to take certain selected portions of the reservation as tribes by an absolute title, or to enlarge the numbers of the Cherokee Nation by adoption, (as in the case of these Delawares,) it was foreseen that the time might come when the allotment might not secure even 160 acres to each individual, and so was added the express guarantee that the purchasing Delawares should obtain at least that amount in the allotment. True, the course of events has not been what was then contemplated, but in order to determine the meaning of this contract we must place ourselves in the circumstances of the parties at the time, with their surroundings and expectations. In that light we see nothing in the matters suggested by counsel sufficient to overthrow the plain import of the language used in the agreement, and must conclude that by such agreement the Delawares became incorporated into the Cherokee Nation, became members thereof, and, as such, entitled equally with the native Cherokees to all their rights in the reservation and outlet.

Further, it may be remarked that the action of the Cherokee Nation up to the year 1882 was in the line of the construction we have placed upon this contract, for up to that date there was no distinction made between the native Cherokees and these Delawares in the distribution of funds from whatever source obtained. Out of the moneys received by the Cherokee Nation on account of lands west of the 96th degree set apart for the Osage Indians, under the act of June 5, 1872, $200,000 was distributed per capita, in which distribution the Delawares shared equally with the native Cherokees. And again, when, on account of sales west of the 96th degree, Congress on June 16, 1880, appropriated $300,000, such sum was also paid out per capita, the Delawares sharing equally with the native Cherokees. Such action is of significance in determining the understanding of the parties to the contract. It is a practical interpretation by the parties themselves of the contract they made. It is also worthy of note that when in 1883 a bill passed the National Council for the payment to the native Cherokees alone of a certain sum of money received as rental from the Cherokee Strip Live Stock Association, which

so far as appears was the first manifestation of a claim of a difference between the native Cherokees and the registered Delawares as to the extent of their interests in the lands or the proceeds thereof, it was vetoed by D. W. Bushyhead, the then Principal Chief of the Cherokee Nation, on the ground that such action was in violation of the agreement of 1867. It is true the bill was passed over his veto. While the veto message is too long to quote in full, these extracts sufficiently disclose the reasons on which it is based:

"3d. The 'patent' was made to the 'Cherokee Nation' in 1838, and the Cherokee Nation was then composed of citizens by right of blood, and so continued to be until the exigencies of the late war arose, when, in 1866, it became necessary to make a new treaty with the United States government. By this treaty, made by and with this Nation, other classes of persons were provided to be vested with all the rights of 'native Cherokees' upon specified conditions. These conditions have been fulfilled as regards the acknowledged colored citizens of this Nation and the so-called Delaware and Shawnee citizens. I refer you to article 9th of said treaty in regard to colored citizens, and article 15th, first clause, as regards Indians provided to be settled east of 96°. The language is, they shall have all the rights of native Cherokees 'and' they shall be incorporated into and ever after remain a part of the Cherokee Nation on equal terms in every respect with native Cherokees.

\*         \*         \*         \*         \*

"6th. If the lands of the Nation were and are the common property of citizens, then no citizen can be deprived of his or her right and interest in the property without doing an injustice, and without a violation of the constitution which we are equally bound to observe and defend. While the lands remain common property, all citizens have an equal right to the use of it. When any of the land is sold under provisions of treaty, all citizens have an equal right to the proceeds of their joint property, whether divided *per capita* or invested.

"Senators, such is the treaty and such is the constitution. I have referred you to them, and stated their evident meaning in the premises 'to the best of my ability,' as is my duty. To

the classes of citizens this bill would exclude, attach 'all the rights and privileges of citizenship according to the constitution.' To three of these classes attach also all the rights of 'native Cherokees,' according to treaty."

Further comment on this case is unnecessary. We see no error in the conclusions of the Court of Claims, and its decree is

*Affirmed.*