Nott, Ch. J.,
delivered the opinion of the court:
The subject-matter of this suit consists of 4,420,076 acres of land in the Cherokee country about to be allotted in severalty among the Cherokee people entitled to participate in the distribution of the common property of the Cherokee Nation. The case was transmitted to the court by the Secretary of the Interior on the 24th of February, 1903. The Secretary thus states in his letter of transmittal the nature of the controversy:
“A controversy has arisen as to the rights of white persons intermarried with Cherokee citizens, and a protest has been filed with this Department on behalf of a large number of citizens of the Cherokee Nation by blood against the enrollment of intermarried persons, ‘ so as.to recognize their right to participate in the distribution of any of the common property of the Cherokee Nation of whatever kind or character.’ It is asserted, on the one hand, that the Cherokee laws have never recognized the right of ‘ intermarried citizens ’ to share in the distribution of the property of the nation, and, on the other hand, that the Cherokee laws as well as the laws of Congress recognize those persons who have been married to Cherokee citizens in accordance with the laws of the Cherokee Nation relating to marriage as full citizens of such nation entitled to share equally with full-blooded citizens in the property of the tribe.” ■
Since the case was transmitted and tried Congress have made the following enactment:
“ That in the case entitled 1 In the matter of enrollment of persons claiming rights in the Cherokee Nation by intermarriage against the United States, departmental, numbered seventy-six,’ now pending in the Court of Claims, the 'said court is hereby authorized and empowered to render final judgment in said case, and either party feeling itself aggrieved by said judgment shall have the right of appeal to *436 the Supreme Court of the United States within thirt}^ days from the filing of said judgment in the Court of Claims. And the said Supreme Court of the United States shall advance said case on its calendar for early hearing.” (Act 3d March, 1905, 33 Stat. L., p. 1071.)
Upon the facts presented, and after carefully considering the questions discussed, the court has reached the following conclusions:
1. The constitution and laws of the Cherokee Nation contemplate three classes of citizens: First, those who are Cherokees by blood; secondj those who are Cherokees bjr intermarriage and the payment of $500'; third, those who are citizens by intermarriage alone. As to the first class, tliejf are communal owners according to Indian tradition and Indian law, and their citizenship, under the constitution of the Cherokee Nation, is indefeasible save by expatriation and becoming citizens of another power, As to the second class, they possess the political rights of Cherokees by virtue of marriage, and become communal owners of the soil and of the vested funds of the nation by virtue of their payment “ into the general fund of the national treasury of a sum of money to be ascertained and fixed by the national council equal to the pro rata share of each native Cherokee in the lands and vested value of the nation, estimated at $500.” (Revised Code, 1874, p. 224.) As to the third class, according to special provisions and necessary implication and long-continued usage, “ the rights and ju’ivileges ” of their limited citizenship do not extend to sharing in the communal property of Cherokees by blood or to an interest in the vested funds of-the nation.
The constitution of the Cherokee Nation, 1839, relates to Cherokees by blood, to their communal ownership of land, and to their citizenship indefeasible save bj'- expatriation (art. 2). The provisions of Cherokee law relating to intermarriage with whites and to citizenship thereby acquired are statutory.
Under the primitive law of the Cherokees, derived from that of the Iroquois, descent was through the mother, and the nation was subdivided into clans or tribes. Within a *437 clan or tribe the members were deemed brothers and sisters and marriage between them unlawful. Consequently intermarriage could only be between members of one tribe and members of another tribe. Such being the fundamental and moral basis of marriage and descent, it followed that when a man married a woman of another tribe he left his own and became a resident in the tribe of his wife. When she died he might continue, through courtesy, to dwell among and b.e a member of the tribe. If he afterwards married a woman of another tribe, he went to dwell with her and among her people. He was not excluded or expelled from the tribe of his first wife, but by his second marriage and change of domicile he necessarily withdrew from it. (Morgan’s League of the Iroquois, pp. 79, 87.)
The law of Indian tribal citizenship or membership was in principle like our own law of domicile — a man does not lose his domicile until he acquires another. When he acquires a new domicile the old one ceases to exist for him. So the Indian widower remained' a quasi citizen or member of his wife’s tribe until he married into another, and then on the acquirement of a new membership in another tribe the old one ceased to be.
If the Indian husband abandoned his wife, abandonment meant withdrawing from her tribe; and, again, necessarily he ceased to have any right or interest therein for the simple reason that whatever right or interest he had within the tribe was due to his being the actual husband of a daughter of the tribe. The statutes of the Cherokees are but a written codification of the primitive law, somewhat adapted in form to the changed conditions of civilization. But the fundamental, primitive idea runs through them, insistent, constant, that all of the man’s rights who marries into the nation are dependent upon and linked to his wife as a daughter of the nation; and when that link is broken, whether by abandonment or by marriage with some woman who is not a daughter of the Cherokee Nation by blood, he thereby drops out of the nation and ceases to be a citizen.
But the fact that there are citizens in the Cherokee country who are communal owners and that there are citizens who *438 are not communal owners presents the question of law whether the lands which form the subject-matter of this suit — lands which are to be divided by allotment among the citizens of the Cherokee Nation — are communal property and belong' exclusively to one class of citizens, or whether they constitute national property in which each and every citizen of the nation has an equal interest independently of the character of his citizenship.
2. That all lands of the Cherokees were primarily communal is too well settled to need reiteration. (Western Cherokees v. United States, 27 C. Cls. R., 1; Journey cake v. Cherokee Nation, 28 id., 281, 303, 305; Whitmire v. Cherokee Nation, 30 id., 138, 158.)
That the United States have repeatedly recognized in their transactions with the Cherokees the dual character of the people — sometimes national, sometimes communal — has appeared in many decisions. (Eastern Cherokees v. United States, 20 C. Cls. R., 449; Western Cherokees v. Same, 27 id., 1; Shawnees v. Same, 28 id., 447; Delawares v. Cherokee Nation, 28 id., 281.)
That the intermarried whites are not communal owners except in cases where they paid into the general fund of the National Treasury a sum of money equal to the pro rata of each native Cherokee in the lands and vested wealth of the nation is a legal condition which appears clearly in the history and statutes of the nation. The controlling principle has been that the “ rights and privileges ” acquired by marriage and residence were political rights and privileges which did “ not extend to right of soil or interest in the vested funds of the nation.” The right to an estate or interest in' the communal property has alwaj^s had to be paid with a price. In the case of the Delawares they became communal owners bjr virtue of the treaty, but they also had to pay, 'first, an amount proportionate to their numbers into the national fund of the Cherokees, and, second, an amount equal to $1 per acre for 160 acres fqr each .individual of the Delaware tribe, ’ analogous to the payment of $500 by an intermarried white Avho would become a communal owner. In the case of the freedmen nothing was paid, because their *439 incorporation with the Cherokees as citizens and communal owners ivas enforced by the United States as a condition to the .continued existence of the Cherokee Nation. “At the close of the civil war the Cherokee country was virtually conquered territory and the Cherokee Nation at the merc)^ of the United States.” (Whitmire v. Cherokee Nation, 30 C. Cls. R., 138, 150.) The Cherokee Nation had taken sides in the civil war, it had been overthrown when the Confederate States fell, and the will of the conqueror was superior to the constitution and statutes.
These facts make a strong case against the intermarried whites, and if they were the only facts probably would be deemed sufficient to establish conclusively the exclusive communal rights of those who are Cherokees b}^ blood.
But in the case of the Delaivares (Cherokee Nation v. Journeycake, 155 U. S. R., 196, 208) the Supreme Court has said: “In December, 1838, a patent was issued to the Oherokees for these lands. By that patent whatever of title toas conveyed toas conveyed to the Cherokees as a nation, and no title was vested in severalty in the Oherokees or any of them." And again: “Not only does the Gherokee constitution thus provide that the lands shall be common property, but also the legislation of the Gherokee Nation from 1839 on to the present time abounds with acts speaking of these lands as public domainor common property ’ of the Gherokee Nation." And again (p. 208) : “Noto, if these lands be the public domain, the common property of the Gherokee Nation, all who are recognized as members and citizens of that nation are alike interested and alike entitled to share in the profits and proceeds thereof.” And again (p. 212) : “It must be borne in mind that the rights and interest which the native Gherokees had in the reservation and outlet sprang solely from citizenship in the Gherokee Nation, and that the grant of equal rights as members of the Gherokee Nation naturally carried with it the grant of all rights springing from citizenship.”
In that case this court had previously reviewed the statutes relating to the “ public domain ” of the Cherokee Nation and said (28 C. Cls. R., 281, 314) : “ With this power of legis *440 lation and control of the public domain and the jus dispo-nendi lodged in the government of the nation it is plain that the communal element has been reduced to a minimum and exists only in the occupied lands.” The decision of the Supreme Court affirming the decision of this court goes further and holds that all lands ceded by the treaties of February 14, 1833, and December 29, 1835, embraced in the patent issued in 1838, were “ conveyed to the Cherokees as a nation,” and consequently were never communal property.
The question whether all intermarried white citizens are entitled to share as such in the distribution of these lands, and the question whether all intermarried whites are citizens, are distinct questions.
3. The constitution of the Cherokee Nation (1839) found the lands of the Cherokees communal, and decreed that they “shall remain common property ” (sec. 2). It made the improvements thereon “ the exclusive and indefeasible j>rop-erty of the citizens, respectively, who made -or may rightfully be in possession of them,” but made no provision concerning citizenship or the admission of aliens by adoption or naturalization. The grant of the legislative power is brief, but comprehensive: “ The national council shall have power to make all laws and regulations which, they shall deem necessary and proper for the good of the nation, which shall not be contrary to this constitution ” (sec. 14). .
The amendments to the constitution (1866) still declare that “ the lands of the Cherokee Nation shall reinain common property,” but at the same time introduce, a modification, “ until the national council shall request a survey and allotment of the same in accordance with the provisions of article 20 of the treaty of 19th of July, 1866, between the United States and the Cherokee Nation ” (sec 2).
The right of a white person to become a citizen of the Cherokee Nation therefore was granted by statute and not by the constitution. It ivas a statutory, not a constitutional, right. It seems, therefore, clear that the pow'er which created — the legislative power — might restrict so long as it did not infringe upon any requirement of the constitution.
*441 In 1874 the rapidly growing value of the Cherokee lands was becoming perceptible. On the one hand, there were white men who desired to marry into the tribe, and, marrying and residing in the nation, desired the rights and privileges of citizens; on the other hand, there were white adventurers desiring to share in the wealth of the nation, soon, it was believed, to become available to individual citizens. The public welfare might be benefited by allowing the one, and most certainly would be conserved by excluding the other. No restriction appeared to exist in the constitution which would forbid the national council from admitting* white men to citizenship upon the condition that they should not acquire an estate or interest in the communal or common property of the nation. Accordingly, the national council enacted, what was already the law by implication, an express proviso to section 75 of the Code of 1874, “ That the rights and privileges herein conferred [the right of white persons to acquire citizenship by intermarriage] shall not extend to right of soil or interest in the vested funds of this nation,” which provision, however, did not take effect until November 1,1875.
Whoever married after that enactment married with due-notice of the limitation set upon his rights and privileges as a citizen. The statute seems just to the then communal or common owners,, and seems but simple prudence and wisdom in looking to the exclusion of persons coming into the nation with unworthy, ulterior designs. There is" no reason for overruling it unless it be contrary to the Cherokee constitution or the statutes of the United States.
The constitutional amendments of 1866 set forth that “All. native-born Cherokees, all Indians, and whites legally members of the nation by adoption, and all freedmen who have-been liberated by voluntary acts of their former owners or by law, as well as free colored persons who were in the country at the commencement of the rebellion * * * shall be taken and deemed to be citizens of the Cherokee Nation ” (sec. 5).
These constitutional amendments were brought about by the action of the United States at the close of the civil war *442 in dictating that the slaves or freedmen or free persons of color in the Cherokee country should not only be admitted to the rights of citizenship, but to an equal participation in the communal or common property of the Cherokees. The Cherokees seemed to have veiled their humiliation by these general declarations of the persons who should be taken and deemed to be citizens. But, be that as it may, the overthrow of the Cherokee Nation and the treaty of peace, 1866, and the terms dictated by the United States whereby their former slaves were made their political equals and the common property of the Cherokees was to be shared equally with their servants and dependents was in effect a revolution. The constitutional amendment quoted was simply declaratory of the new order of things. It is not necessarily prospective, and it does not impose limitations upon the legislative power with regard to the naturalization or future adoption of aliens as citizens. Under the polity of the Cherokees citizenship and communal ownership were distinct things. The citizen who annually received an annuity derived from a communal fund held by the United States, and the citizen who never received a dollar from the fund and never so much as thought of receiving it, formed a concrete object lesson in constitutional law not easily effaced from the common mind.
There are provisions in the statutes of the United States relating to the enrollment of the Cherokees for the purposes of the allotment of lands which have been relied upon as controlling the court and securing the property rights of all intermarried whites. But, in the language of Chief Justice Fuller in Stephens v. Cherokee Nation (174 U. S., 445, 488) : “ It may be remarked that the legislation seems to recognize, especially the act of June 28, 1898, a distinction between admission to citizenshixo merely and the distribution of property to be subsequently made, as if there might be circumstances under which the right to a share in the latter would not necessarily follow from the concession of the former.” It can not be supposed for a moment that Congress intended by this legislation to take away from some of the Cherokee people property which was constitu *443 tionally theirs or to confer upon white citizens property which they were not legally entitled to have. The term “ citizens ” in these statutes of the United States must be construed to mean those citizens who were constitutionally or legally entitled to share in the allotment of the lands.
4. The question whether all intermarried whites are citizens is a distinct question. There come before the court a_ class of claimants known as the “ married out and abandonment cases,” claimants who allege, on the one hand, that they became citizens of the Cherokee Nation by intermarriage, but concede, on the other hand, that they have since married persons, white persons, having no rights of Cherokee citizenship by blood, or that they have abandoned their Cherokee wives. It is ■ contended on behalf of these claimants that the question of their continued citizenship or loss of citizenship can not be inquired into; that having once been entitled to the rights and privileges of citizenship as intermarried whites, they can only be deprived of them by a proceeding in the nature of office found.
“Every person is supposed.to be a natural-born subject that is resident in the kingdom,” says Bacon. (11 Wheat., p. 356.) If some such person, resident in the United States, and therefore owing a local allegiance to this Government (Carlisle & Henderson's case, 16 Wall., 147), should bring an action in this court and the Government should file a plea to the jurisdiction averring that the claimant was an alien not entitled to maintain an action against the Government of this country within the intent- and meaning of Eevised Statutes, section 1068, could such a claimant turn around and say that the question of his citizenship could be inquired into only by office found? Assuredly not. The fact that there has been no proceeding in the nature of office found against 'these -claimants does not, in the opinion of the court, control the case. Office found is a proceeding preliminary to the eviction of an alien in possession who would be entitled to hold if he were not an alien. The King should not evict him forcibly, and could not maintain an action ■ of ejectment, not having a superior title. The proceeding is nothing more than a form of action. A man alleging one *444 state of facts must sue in ejectment; alleging another state of facts, he must sue in trespass, etc. So the King, seeking the aid of a court to establish the fact that the person in possession is incapable of .holding the land as against the Crown, must do so by the proceeding .of office found. These intermarried whites are not grantees or devisees seized and in possession of land, occupying the position of defendants. They occupy the contrary position — of plaintiffs seeking to recover money — and it is obligatory upon them to establish their right to it. To say that a white man can share in the property of the Cherokees for the reason that at one time in his life he was the husband of a Cherokee woman, and to say that this court, or the Secretary of the Interior, must hold that he is still the husband of a Cherokee woman because the contrary has not been established in another proceeding, is an appeal to technicality which the court can not uphold. These claimants, like other plaintiffs, must prove their case; asserting a present right, they 'must establish present conditions. The laws and usages of the Cherokees, their earliest history, the fundamental principles of their national policy, their constitution and statutes, all show that citizenship rested on blood or marriage; that the man who would assert citizenship must establish marriage; that when marriage ceased (with a special reservation in favor of widows and widowers), citizenship ceased; that when an intermarried white married a person having no rights of Cherokee citizenship by blood it was conclusive evidence that the tie which bound him to the Cherokee people was severed and the very basis of his citizenship obliterated.
The Cherokee statute which has been cited (Laws of 1892, section 669) gives a proceeding in the nature of office found, but, nevertheless, is confirmatory of the views hereinbefore expressed. It relates to cases where the Cherokee government takes the initiative to accomplish a purpose. That is to say, where an intermarried white man has forfeited his rights of citizenship in the nation by acts which declare such forfeiture “ and the nation requires his removal beyond the limits of its territory,” this proceeding must be resorted *445 to, to be followed by a call on the United States Indian agent “ to remove such a white man.” It is in principle precisely like the common-law procedure of office found, and exists for the same reason — that the Government maj’- exercise a right dependent only upon the alienage of a person living within its territor)'- presumably a citizen.
To prevent misapprehension, it is stated and to be understood that the onty things intended to be decided by this opinion are: First, that, under the decision of the Supreme Court in Cherokee Nation v. Journey cake (155 U. S., 196, 208), the lands which are to be allotted among the Cherokees are not communal property, but constitute the public domain of the nation; second, that in this public domain all Cherokees bjr blood and whites by intermarriage who became citizens prior to the 1st November, 1875, are equally interested and have equal per capita rights in the allotment of lands; third, that the rights and privileges of those intermarried white citjzens who married persons of Cherokee blood subsequent to the 1st dajr of November, 1875, do not extend to right of soil or interest in the vested funds of the nation, and that they are not entitled to share in the allotment of the public domain except in cases where they paid into the general fund of the National Treasury the sum of $500 each; fourth, that those ivhite citizens who, subsequent to their marriage with persons of Cherokee blood, have married persons not of Cherokee blood, and those white men who, being husbands of women of Cherokee blood, have abandoned their wives, are not. citizens of the Cherokee Nation and are not entitled to participate in the allotment of these lands.
A decree will be entered in this case following the form of that which was entered in the case of Journeycake v. Cherokee Nation (28 C. Cls. R., 281), in accordance with the directions heretofore set forth in this opinion.
The facts stipulated by the parties (Record, p. 99) and any additional facts which may be stipulated, will stand as the findings of the court for the purposes of appeal, if any. If no .appeal be taken by any party the foregoing opinion *446 will be certified to the Secretary of the Interior for his information and guidance, as provided b}*' law, and in response to his communication of February 24, 1903.
Pursuant to the opinion of the court and in conformity with the conclusions of law (ante) the following decree was entered on the 18th May, 190o:
This case having been transmitted to this court by the Secretary of the Interior by letter dated February 24, 1903, for the findings and opinion of the court in accordance with the provisions of section 2 of the act of Congress of March 3, 1883, entitled “An act to afford assistance and relief to Congress and the Executive Departments in the investigation of claims and demands against the Government ” (22 Stat. L., 485) ; and Congress, by the act of March 3, 1905, entitled “An act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June 30, 1906, and for other purposes,” having made the following enactment:
“ That in the case entitled ‘ In the matter of enrollment of persons claiming rights in the Cherokee Nation by intermarriage against the United States (Departmental, No. 76),’ now pending in the Court of Claims, the said court is hereby authorized and empowered to render final judgment in said case, and either party feeling itself aggrieved by said judgment shall have the right of appeal to the Supreme Court of the United States'within thirty days from the filing of said judgment in the Court of Claims. And - the said Supreme Court of the United States shall advance said case on its calendar for earfy hearing.”
AncV the cause coming on to be heard upon the petition, answers, agreed facts, proofs, and arguments submitted by the attorneys óf the parties to the cause, respectively, and the court having heard and fulty considered the same;
And it appearing to the court that all those white jiersons who married Cherokee Indians by blood subsequently to the enactment of the Cherokee law, which became effective November 1, 1875, and which declared that such persons *447 by intermarriage acquired no rights of soil or interest in the vested funds of the nation, had due notice of the limitations set upon their rights and privileges as citizens; and that those white persons who married Cherokee citizens by blood prior to said date acquired rights as citizens in the lands belonging to the nation, and held and owned as national lands, except such of these intermarried persons as lost their rights as Cherokee citizens by abandoning their Cherokee wives or by marrying other white or nontribal men or women having no rights of citizenship by blood in said Cherokee Nation:
It is by the court ordered, adjudged, and decreed that such white persons residing in the Cherokee Nation as become Cherokee citizens under Cherokee laws by intermarriage with Cherokeés by blood prior to the 1st day of November, 1875, are equally interested in and have equal per capita rights with Cherokee Indians by blood in the lands constituting the public domain of the Cherokee Nation, and are entitled to be enrolled for that purpose, but such intermarried whites acquired no rights and have no interest or share in any funds belonging to the Cherokee Nation except where such funds were derived by lease,' sale, or otherwise from the lands of the Cherokee Nation conveyed to it by the United States by the patent of December, 1838; that the rights' and privileges of those white citizens who intermarried with Cherokee citizens ‘ subsequent to the 1st day of November, 1875, do not extend to the right of soil or interest in any of the vested funds of the Cherokee Nation, and such intermarried persons are not entitled to share in the allotment of the lands or in the distribution of airy of the funds belonging to said nation, and are not entitled to be enrolled for such purpose; that those white persons who intermarried with Delaware or Shawnee citizens of the Cherokee Nation either prior or subsequent to November 1, 1875, and those who intermarried with Cherokees by blood and subsequently being left a widow or Avidower by the death of the Cherokee Avife or husband, intermarried with persons not of Cherokee blood, and those white men who having married Cherokee Avomen and subsequently abandoned their Chero *448 kee wives have no part or share in the’ Cherokee property, and are not entitled to participate in the allotment of the lands or in the distribution of the funds of the Cherokee Nation or people, and are not entitled to be enrolled for such purpose.