SHULTHIS v. MacDOUGAL et al. (BERRYHILL, Intervener).

(Circuit Court, E. D. Oklahoma. December 28, 1907.)

No. 1.

1. INDIANS—DESCENT AND DISTRIBUTION.

Under the provisions of section 28 of the original agreement between the United States and the Creek Nation and approved by Act Cong. March 1, 1901, c. 676, 31 Stat. 869, no child born to Creek citizens after July 1, 1900, was eligible to the roll. Under the provisions of Act Cong. May 27, 1902, c. 888, 32 Stat. 245, and section 7 of the supplemental agreement made with the Creeks and approved by Act Cong. June 30, 1902, c. 1323, 32 Stat. 501, children born to citizens subsequent to July 1, 1900, up to and including May 25, 1901, and living upon the latter date, were eligible to the roll of citizenship, and directed to be enrolled by the Commission. If any such child died after May 25, 1901, or at any time before receiving his allotment, it was provided that "the lands and moneys to which he would be entitled if living shall descend to his heirs as herein provided and be allotted and distributed to them accordingly." Section 6 of the said supplemental agreement, approved in 1902, repealed the provisions of the act of Congress of March 1, 1901, in so far as they provided for descent and distribution according to the laws of the Creek Nation, and directed that "the descent and distribution of land and money provided for shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas." *Held*, that a

child born to citizens of the Creek Nation on May 6, 1901, living May 25, 1901, dying in November, 1901, enrolled by the Commission on October 8, 1902, allotment selected on April 28, 1904, and patent issued to his heirs on October 10, 1904, the Arkansas law of descent and distribution embodied in chapter 49, §§ 2522–2545, of Mansfield's Digest (Ind. T. Ann. St. 1899, §§ 1820–1843), nominated the heirs of such deceased child and fixed the shares and portions the heirs derived in such allotment set apart and patented to them.

2. SAME—AGREEMENTS WITH INDIANS—CONSTRUCTION—EXTRANEOUS AIDS.

Whom the parties to the agreement meant to include within the term "heirs," if not clearly expressed, must be ascertained by resort to such extraneous light as the provisions and other acts and agreements relating to the same subject, and the history and surrounding conditions at the time, will afford.

3. SAME—AMBIGUITY.

The use of the term "descend," in the act of Congress and the agreements, being applied where descent, technically speaking, could not take place, creates an uncertainty and ambiguity calling for construction.

4. SAME—TAKING BY PURCHASE AND NOT BY DESCENT.

Where the deceased died before being enrolled, and the allotment selected or patented to him, his heirs take by purchase as donees of the nation, and not by descent.

5. SAME.

It was the evident intent of Congress and the tribe to allot the lands in severalty among the citizens upon the basis of justice, equity, and equality, and it was the intention of the parties to the supplemental agreement that in case a member of the tribe died before receiving his allotment which he would have been entitled to, if living, his heirs should take in all respects and with the same effect as if such member had not died until after receiving the allotment.

6. SAME—"NEW ACQUISITION"—ALLOTMENT.

Under the Arkansas law of descent and distribution an allotment acquired by a Creek citizen by selection and certificate of allotment or by patent became a "new acquisition," and upon the death of such citizen, before allotment or after allotment, without issue, or brothers or sisters, leaving a father, such father took a life estate; the fee passing to the uncles and aunts.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, p. 4783.]

7. LIFE ESTATES—RIGHTS OF LIFE TENANT—OPENING MINES OR WELLS.

A life tenant of lands containing minerals, oil, or gas cannot open mines or wells, or lease the land to others for such purposes.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 33, Life Estates, § 31.]

8. STATUTES—CONSTRUCTION—NATURAL MEANING.

In construing statutes like the ones in question, it is generally safe to reject an interpretation that does not naturally suggest itself to the mind of a casual reader, but is rather the result of a laborious effort to extract from the statute a meaning which it does not at first seem to convey.

9. INDIANS—AGREEMENTS—CONSTRUCTION—TECHNICAL MEANING.

In construing any treaty or agreement between the United States and an Indian tribe, such treaty or agreement must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.

10. SAME—INHERITED LANDS.

Under the provisions of section 22 of the act of Congress approved April 26, 1906 (34 Stat. 145, c. 1876), providing "that the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selec-

tion has been made, or to whom a deed or patent has been issued for his or her share of the lands of the tribe to which he or she belongs or belonged may sell and convey the lands inherited from such decedent," the heirs (not full-bloods) of a deceased Indian, who died before his selection was made or patent issued, may sell and convey the allotment inuring to them as such heirs.

**11. Same—"Inherited"—"Descend."**

The term "inherited" used in section 22 of said act of Congress (Act April 26, 1906, c. 1876, 34 Stat. 145), is synonymous with the word "descend," as used in the original agreement and supplemental agreement, and covers those cases where heirs take by purchase, as well as by inheritance, technically speaking.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, pp. 2012–2014; vol. 4, pp. 3606–3607.]

**12. Same.**

Section 22 of said act of Congress (Act April 26, 1906, c. 1876, 34 Stat. 145), must be construed together with all other cognate acts, and, there being no reason for any distinction or discrimination between heirs taking by purchase and heirs taking by descent, technically speaking, the said section applies to all allotments selected by or for deceased members of the tribe in the hands of their heirs, whether such deceased member died before or after receiving the allotment.

(Syllabus by the Court.)

In Equity.

C. L. Thomas and Edgar A. De Meules, for complainant.

S. V. O'Hare and Farrar McCain, for intervener.

Geo. S. Ramsey and Preston C. West, for defendants.

CAMPBELL, District Judge. This is a suit in equity, instituted by the complainant, Albert W. Shulthis, against the defendants, asserting his right to the oil and natural gas in and under the N. E. ¼ of the N. W. ¼ of section 18, township 17, range 12 E., of the Indian base and meridian, in Oklahoma, and praying that the defendants be enjoined from interfering with his use and occupancy of said land and from going upon and operating or prospecting the same for oil and gas purposes, that the cloud cast upon his title by the adverse claims of defendants be removed, that an accounting be had, and that he recover damages for being kept out of the possession of said property by said defendants. The land in controversy is a part of that body of land formerly comprising the Creek Nation in the Indian Territory. The complainant claims under a departmental oil and gas lease, executed to him by George Franklin Berryhill, a citizen of the Creek Nation, of less than full blood, and Clementine Berryhill, his wife, a noncitizen, in March, 1906, filed in the office of the United States Indian agent, at Union Agency, Muskogee, Ind. T., on April 21, 1906, and in April, 1907, approved by the Assistant Secretary of the Interior. On June 5, 1906, George Franklin Berryhill and Clementine Berryhill, his wife, executed to the defendants Edmond and Perry McKay a warranty deed, conveying the land in controversy and other lands for a consideration of $2,000. In October, 1906, the McKays for a consideration of $800 executed an oil and gas mining lease to one Arthur B. Reese, covering the land in controversy. In the month of August, 1907, and subsequent to the 8th

day thereof, the defendant D. A. MacDougal secured deeds from the brothers and sisters of George Franklin Berryhill, upon the theory that they had inherited the fee in these lands as the uncles and aunts of Andrew J. Berryhill, the deceased child of George Franklin Berryhill, hereinafter referred to. Thereafter, and prior to the final approval of complainant's oil and gas lease, the defendant Kiefer Oil & Gas Company secured a lease of the land for oil and gas purposes from MacDougal, and also through a series of intermediate leases or assignments became the owners of the oil and gas lease executed by the McKays to Reese. In April, 1907, the Kiefer Oil & Gas Company entered upon said land and began developing the same, and at the time of the filing of this suit had made extensive developments thereon, and had taken and were taking large quantities of oil therefrom. A receiver has been appointed, and is now in charge of the property pending this litigation. Since the commencement of this suit George Franklin Berryhill has filed his bill of intervention herein, asking that the defendants be decreed to have no interest in the lands and that he be decreed the owner in fee, subject only to complainant's oil and gas lease, and that he recover 10 per cent. of the oil taken from the land by the defendant Kiefer Oil & Gas Company, and that the deeds and leases under which the defendants claim be declared null and void and may be delivered up and canceled as a cloud on his title.

In order to understand the contentions of the various parties, it is necessary to briefly review the history of the title to these Creek lands and the legislation affecting them. Early in the last century, by a series of negotiations and treaties between the United States and the Creek tribe of Indians, then residing east of the Mississippi, it was provided that said tribe should remove to lands west of the Mississippi river. By a treaty entered into between the United States and the Creek Indians in 1833 (7 Stat. 417), relative to lands which they had previously selected west of the Mississippi, it was provided that a patent in fee simple to this nation of Indians covering the lands assigned them west of the Mississippi should be granted them whenever the treaty should be ratified by the President and Senate of the United States, guaranteeing said lands to them so long as they should exist as a nation and continue to occupy the country thereby assigned them. Shortly thereafter patent was granted to the Creek Nation in accordance with the treaty, covering the lands which we now know as the lands of the Creek Nation, in what was formerly Indian Territory, and of which the land in controversy was a part. For more than half a century the Creek Nation continued to occupy these lands without any change in their status. During all this time they existed as a distinct community, with boundaries fixed, enjoying the right of local self-government, having their own Legislature, their own laws, including laws governing the distribution of the property of the deceased members of the tribe, having their own executive officers, and their own courts. The title to the lands remained in the nation, each individual enjoying only the possessory right to occupy a certain portion of the tribal domain.

But with the lapse of time and the development of the West came the demand for statehood and the allotment of the tribal lands in the Indian Territory to the individuals of the various nations or tribes, and on March 3, 1893, Congress passed the act providing for what has come to be commonly known as the "Dawes Commission," or "Commission to the Five Civilized Tribes." Act March 3, 1893, c. 209, 27 Stat. 645. Under the authority of this and subsequent acts of Congress, the said Commission proceeded to enroll the members of the various tribes, for the purpose of providing a complete and accurate list of the citizens of said nation as a basis of allotment. It was provided in the act creating the Commission just referred to that agreements looking to the allotment of the lands in severalty among the members of the various tribes should be entered into with the tribes, and on March 1, 1901, the Commission and the Creek Nation entered into their first agreement, providing in detail for the allotment in severalty of the Creek lands, commonly known as the "Original Creek Agreement" (Act March 1, 1901, c. 676, 31 Stat. 863), providing that all the lands of the tribe, except as therein provided, should be allotted among the citizens of the tribe by said Commission, so as to give each an equal share of the whole in value as nearly as might be, and then providing in detail a scheme of allotment. By this agreement it was further provided:

"Section 28. No person, except as herein provided, shall be added to the rolls of citizenship of said tribe after the date of this agreement, and no person whomsoever shall be added to said roll after the ratification of this agreement. All citizens who were living on the 1st day of April, 1899, entitled to be enrolled under section 21 of the act of Congress approved June 28, 1898, entitled 'An act for the protection of the people of the Indian Territory and for other purposes,' shall be placed upon the rolls to be made by said Commission, under said act of Congress, and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly. All children born to citizens so entitled to enrollment, up to and including the 1st day of July, 1900, and then living, shall be placed on the rolls made by said Commission; and if any such child die after said date, the lands and moneys to which it would be entitled, if living, shall descend to its heirs, according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

On June 30, 1902, another agreement was entered into, which is known as the "Supplemental Creek Agreement" (Act June 30, 1902, c. 1323, 32 Stat. 500). This latter agreement was amendatory of the original agreement, and among others contained the following provisions:

"Sec. 6. The provisions of the act of Congress approved March 1, 1901 [the original agreement], in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed, and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas, now in force in Indian Territory: Provided, that only citizens of the Creek Nation, male and female, and their Creek descendants, shall inherit lands of the Creek Nation; and provided further, that if there be no person of Creek citizenship to take the descent and distribution of said

estate, then the inheritance shall go to the noncitizen heirs in the order named in said chapter 49."

"Sec. 7. All children born to those citizens who are entitled to enrollment as provided by the Act of Congress approved March 1, 1901 [the original agreement], subsequent to July 1, 1900, and up to and including May 25, 1901, and living upon the latter date, shall be placed on the rolls made by said commission. And if any such child has died since May 25, 1901, or may hereafter die before receiving his allotment of lands and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled if living, shall descend to his heirs as herein provided and be allotted and distributed to them accordingly."

On the 6th day of May, 1901, there was born to George Franklin Berryhill and his wife, Clementine, a son who was named Andrew J. Berryhill. This child died the following November. It will be noted, therefore, that at the time of his birth, as well as at the time of his death, the original Creek agreement was in force, section 28 of which provided that children born to Creek citizens up to and including the 1st day of July, 1900, might be enrolled, but did not provide for the enrollment of children born subsequent to that date, and therefore, at no time during the life of Andrew J. Berryhill was he entitled to enrollment; but by the supplemental agreement, above quoted, he did become entitled to enrollment, for he was born prior to May 25, 1901, and was living upon that date. On October 8, 1902, his name was placed upon the approved Creek Indian roll of the Creek Nation. On April 28, 1904, selection of his allotment was made, and appears upon the official allotment plat of the Commission as the "allotment of Andrew J. Berryhill, deceased." On October 10, 1904, patent, subsequently approved by the Secretary of the Interior, issued from the Creek Nation to "the heirs of Andrew J. Berryhill, deceased," conveying to them the said allotment. The land in controversy is a portion of this allotment.

It is contended by the complainant that the heirs of Andrew J. Berryhill, deceased, acquired title to the lands in controversy by purchase and not by descent; that George Franklin Berryhill, as the nearest in line of succession, acquired an absolute estate in fee simple to the lands in controversy, and that the restriction on the alienation of the lands in controversy did not expire until August 8, 1907; and that, therefore, the deed under which the defendants Edmond McKay, Perry McKay, and Kiefer Oil & Gas Company claim is void. Complainant further contends that, even if the deed from the Berryhills to the McKays and the subsequent leases and conveyances were valid, they were taken with notice of the complainant's lease The defendants contend that the only estate George Franklin Berryhill has in the land, if any, is a life estate, and that therefore he cannot make a valid oil and gas lease, and that complainant's lease is therefore void. They further contend that, if Berryhill did have such an estate in the land as that he could make a valid lease, complainant's failure to comply with the terms of the lease, as to filing bond, etc., within the time required, followed by lessor's sale of the land and notice of rescission, voided the defendant's lease. Defendants further contend that they were innocent purchasers in good faith, for value, without notice of complainant's claim. The intervener contends that at the time of the

alleged sale to the McKays 'the land was still subject to restrictions against alienation, and was not "inherited land," and was therefore not relieved of restrictions by Act April 26, 1906, c. 1876, 34 Stat. 137. It is conceded that under the provisions of the supplemental agreement the mother, Clementine Berryhill, has no interest in the land; she not being of Creek blood.

We will first consider the question as to whether George Franklin Berryhill was an heir of Andrew J. Berryhill, deceased, and, if so, his interest as such in the land in controversy. If no further legislation had been enacted after the passage of the original agreement, it is clear that the child, Andrew J. Berryhill, would not have been entitled to an allotment, for he was born subsequent to July 1, 1900; but in the appropriation act of May 27, 1902 (32 Stat. 245, c. 888), Congress provided for the enrollment of all children born to members of the tribe, up to and including May 25, 1901, and then living, and that, if any such child should die before receiving his allotment, such allotment should descend to his heirs and be distributed to them according to the laws of Arkansas; it being also provided that the provisions of the original agreement relative to descent and distribution according to the laws of the Creek Nation should be repealed, and providing that the descent and distribution of the lands and money provided for by the original agreement should be in accordance with the provisions of chapter 49, Mansf. Dig. Ark. (Ind. T. Ann. St. 1899, c. 21). By reference to section 6 and section 7 of the supplemental agreement, above quoted, it will be observed that the provisions of the act of May 27, 1902, just referred to, were incorporated in the supplemental agreement. By Act Cong. May 2, 1890, c. 182, 26 Stat. 81, it was provided that certain laws of the state of Arkansas, as published in Mansfield's Digest of the Laws of that State, "not locally inapplicable, nor in conflict with this act, or with any laws of Congress relating to the subjects specially mentioned in this section, are hereby extended over and put in force in the Indian Territory, until Congress shall otherwise provide"; and among these laws was chapter 49, relating to descents and distribution. Prior to the supplemental agreement, these laws of Arkansas, controlling descent and distribution, were inapplicable to the Creek Nation, as it had its own local laws covering the subject. By the Arkansas law thus adopted it was provided:

"Sec. 2522. When any person shall die, having title to any real estate of inheritance, or personal estate not disposed of, * * * and shall be intestate as to such estate, it shall descend and be distributed in parcenary to his kindred, male and female, * * * in the following manner: First, to children or their descendants, in equal parts; second, if there be no children, then to the father, then to the mother; if no mother, then to the brothers and sisters, or their descendants, in equal parts," etc.

"Sec. 2531. In cases where the intestate shall die without descendants, if the estate come by the father, then it shall ascend to the father and his heirs; if by the mother, the estate, or so much thereof as came by the mother, shall ascend to the mother and her heirs; but if the estate be a new acquisition, it shall ascend to the father for his lifetime, and then descend in remainder to the collateral kindred of the intestate, in the manner provided in this act; and in default of a father, then to the mother, for her lifetime; then to descend to the collateral heirs, as before provided."

"Sec. 2543. The expression used in this act, 'where the estate shall have

162 F.—22

come to the intestate on the part of the father,' or 'mother,' as the case may be, shall be construed to include every case where the inheritance shall have come to the intestate by gift, devise, or descent from the parent referred to, or from any relative of the blood of such parent."

It must be borne in mind that Andrew J. Berryhill died before the supplemental agreement, entitling him to enrollment, became the law, and therefore, at his death, had no title to the land in controversy. But section 7 of the supplemental agreement provided for his enrollment even after his death. When enrolled, he became one of the units of allotment as much as though still living, for the roll was the basis for allotment, and there was to be an allotment made for every member appearing upon the roll, either selected by himself, by some one representing him, whether he be living or dead, or in default of such selection the allotment was to be selected by the Commission. Here, then, was an allotment, the title to which must pass from the tribe to some individual member or members of the tribe. It could not pass to Andrew J. Berryhill, whose enrollment had caused it to be carved out of the common domain, for he was dead. Section 6 of the supplemental agreement provided that the descent of allotments should be in accordance with the Arkansas law; but this allotment could not descend, technically speaking, under the Arkansas law, because the intestate had not died having the title thereof. This would be true of all allotments selected after the death of the person by the enrollment of whom the allotment had been occasioned. In the nature of things, the vast majority of those enrolled would live to receive their allotments, and consequently the provisions of section 6 would govern descent and distribution in all cases except the comparatively few who should die before allotment. It therefore became necessary for the agreement to provide for the disposition of those allotments not covered by the general provisions of section 6, and it was therefore added that in such cases the lands and money to which he (the deceased enrolled member) would be entitled, if living, should descend to his heirs as therein provided, and be allotted and distributed to them accordingly. In the cases covered by this provision the title to the land passed directly from the Creek Nation to the heirs, who, therefore, technically speaking, took the same by "purchase," and not by descent; the title never having vested in the ancestor. "In one thing all writers agree, and that is in considering that there are two modes only, regarded as classes, of acquiring a title to land, namely, descent and purchase; purchase including every mode of acquisition known to the law except that by which an heir, on the death of an ancestor, becomes substituted in his place as owner by act of the law." 3 Washburn on Real Property, p. 4. It is therefore in the nature of a grant of the land to which, if living, the deceased enrolled member would be entitled, from the Creek Nation to the heirs of such deceased.

The question for determination is: Whom did the parties to this agreement mean to include by the term "heirs," and in what proportion did they intend such persons to take? Their intention in this matter must control, and this we must gather from the terms of the agreement itself, if clearly expressed, and, if its provisions are ambiguous and uncertain, then resort must be had to such extraneous light as the

provisions of other acts and agreements relating to the same subject and the history and surrounding conditions at the time will afford. "It is indispensable to a correct understanding of a statute to inquire, first, what is the subject of it—what object is intended to be accomplished by it? When the subject-matter is once clearly ascertained, and its general intent, a key is found to all its intricacies. * * * General words may be restrained to it, and those of narrower import may be expanded to embrace it, to effectuate that intent. When the intention can be collected from the statute, words may be modified, altered, or supplied, so as to obviate any repugnancy or inconsistency with such intention. * * * In the Eureka Case, 4 Sawy. 302, Fed. Cas. No. 4,548, Mr. Justice Field said: 'Instances without number exist where the meaning of words in a statute has been enlarged or restricted and qualified to carry out the intention of the Legislature.' * * * Where the meaning of a statute, or any statutory provision, is not plain, a court is warranted in availing itself of all legitimate aids to ascertain the true intention, and among them are some extraneous facts. The objects sought to be accomplished exercise a potent influence in determining the meaning of not only the principal, but also the minor, provisions of a statute. To ascertain it fully, the court will be greatly assisted by knowing, and it is permitted to consider, the mischief intended to be removed or suppressed, or the necessity of any kind which induced the enactment." Lewis' Sutherland, Statutory Construction, vol. 2, §§ 347, 456.

By the use of the term "descend," as applied to conditions where descent, technically speaking, could not take place, an uncertainty or an ambiguity is clearly injected into this act, which calls for construction. If it was the intention of the framers of this act that the heirs of enrolled members, dying before allotment, should take the allotments just as if their ancestors had received their allotments before death, then we must look to chapter 49, as a whole, and from that determine, not only who the heirs are, but the proportion in which they take. If, on the other hand, it was intended that the persons included in the term "heirs" should take merely as "purchasers," and not as though taking technically by descent, then the contention of complainant that, having determined by reference to the first section of chapter 49 who the heirs are, the Arkansas law, so far as this class of cases is concerned, has served its purpose, is well supported by authorities. It must be borne in mind at all times, in construing these agreements, that the purpose, as expressed in the act creating the Commission, was to effect the allotment and division of these lands in severalty among the Indians of each nation or tribe, upon the basis of justice and equity, to enable the ultimate creation of a state or states of the Union, which should embrace the lands within said territory. The Commission was directed to enter upon negotiations with the several nations, and endeavor to procure such allotment of lands in severalty to the Indians belonging to each such nation, tribe, or band, respectively, as might be agreed upon as just and proper, to provide for each such Indian a sufficient quantity of land for his or her needs in such equal distribution and apportionment as should be found just and suited to the cir-

cumstances. An equal or equitable division of the lands must be made; that is, each member must receive the same treatment with reference to the division of the lands as every other member occupying the same relative position.

With the foregoing consideration in view, let us examine the act. It is provided that the lands to which Andrew J. Berryhill would have been entitled, if living, shall descend to his heirs as "herein provided"; that is, "in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas," as provided by section 6 of the act. So far, the act is possible of two constructions, either that the words "as herein provided" only have reference to the preceding term "heirs," or that they also have reference to the preceding term "descend"; but the act goes farther and provides that such lands shall be allotted to the heirs "accordingly." According to what? Clearly according to the provisions of chapter 49, above referred to. If the intention of the law is that the heirs of Andrew J. Berryhill shall be different in person, or in the proportion in which they take the land, from what they would have been, had he lived until after getting his allotment and then died, there must have been some reason for this difference, based upon a difference in their status, from that of heirs taking technically by descent; otherwise, the principle of an equitable distribution of the lands would be violated. The only difference in status is that the ancestor died before the allotment was made, instead of afterward. Had Andrew J. Berryhill died one day before the date upon which he might have received his allotment certificate, the disposition of the lands in controversy would have been governed by the portion of the act we are construing. Had he died one day after receiving his allotment certificate, no one would contend that the disposition of his land was not governed by the provisions of chapter 49, both as to who the heirs are and the proportion in which they take. I can perceive no such difference in the status of the heirs of Andrew J. Berryhill from those of an allottee dying after having received his allotment as would justify or furnish a reason for the distinction claimed. I believe the term "descend" was used in the act for the purpose of bringing this class of cases within the perview of chapter 49, and that it was intended that they should not take differently from those coming technically within the act. As said by the Circuit Court of Appeals for the Eighth Circuit in Ardmore Coal Co. v. Bevil, 61 Fed. 757, 10 C. C. A. 41, in construing a statute like this:

"It is generally safe to reject an interpretation that does not naturally suggest itself to the mind of a casual reader, but is rather the result of a laborious effort to extract from the statute a meaning which it does not at first seem to convey."

In Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, it is said:

"In construing any treaty between the United States and an Indian tribe, * * * the treaty must * * * be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indian."

Had it been the intention of the framers of the law that it should be construed as contended for by complainant's counsel, it would have been an easy matter to have made such intention plain. On the other hand, the use of the term "descend" tends to negative such an intention, if it was used with any idea of its ordinary significance. I am not unmindful of the principle that the contemporaneous construction of an act of Congress by executive officers called upon to administer it, while not controlling, is ordinarily entitled to much consideration by the courts when called upon to construe such acts, and that the approval of the lease to complainant by the Department of the Interior indicates that that department construed the law as vesting in George Franklin Berryhill a fee-simple title to the land in controversy. But this question is now squarely presented to the court for decision for the first time, upon a full argument and presentation of authorities pro and con, upon careful consideration of which I am unable to agree with what appears to be the conclusion reached by the department.

It is further to be noted that the very fact that this provision appears in the act makes it clear that the framers realized that without it the Arkansas law adopted would probably not apply, because of the fact that at the death of the ancestor the title to the allotment had not passed to him. Realizing this, and the necessity of a special provision to cover such cases, this provision was inserted, specifically applying the Arkansas law to this class of cases. I therefore conclude that it was the intention of the parties to the supplemental agreement that, in the case of an enrolled member of the Creek Nation or Tribe of Indians dying before receiving the allotment to which he would have been entitled had he lived until selection was made and certificate issued, his heirs should take in all respects as if such member had not died until after receiving his allotment.

We now come to consider what estate the father, George Franklin Berryhill, acquired in his son's allotment by virtue of the Arkansas law. This law has been fully construed by the Arkansas Supreme Court in the celebrated case of Kelly v. McGuire, 15 Ark. 580, decided long before the adoption of the law here, and consequently is controlling. By reference to section 2522 it will be seen that, as Andrew J. Berryhill died without children or descendants, his estate passed to his father; but, to ascertain the extent of the interest in the land taken by the father, reference must also be had to section 2531, which provides that, in the absence of descendants, the estate, if it come by the father, shall ascend to the father and his heirs, and if by the mother, then to her and her heirs; but if it be a "new acquisition," it shall ascend to the father for his lifetime, and then descend in remainder to the collateral kindred of the intestate. As said in Kelly v. McGuire, supra:

"The first section (2522) is general and comprehensive, embracing all lands, whether ancestral or newly acquired, subject to certain exceptions, and qualifications hereafter more particularly noticed, and these exceptions refer to real estate alone."

The exceptions and qualifications referred to are those contained in section 2531, distinguishing between newly acquired and ancestral es-

tates. Finally the court in that case reaches a series of conclusions among which are the following:

"Third. That as to real estate it was the design of the Legislature, where there were no descendants, to point out the lines of the succession, and that this is to depend on the fact whether the inheritance is ancestral or new, and, if ancestral, then whether it come from the paternal or maternal line.

"Fourth. If the inheritance was ancestral and come from the father's side, then it will go to the line on the part of the father, from whence it came, not in postponement, but in exclusion, of the mother's line; and so, on the other hand, if it come from the mother's side, then to the line on the part of the mother, from whence it came, to the exclusion of the father's line.

"Fifth. If the inheritance be not ancestral, but a new acquisition, then, after a life estate, reserved in succession to the father and mother, if alive, it will go in remainder, first to the line of the intestate's paternal uncles and aunts," etc.

The question, then, is whether these allotments are new acquisitions or ancestral estates in the hands of the original allottee. The distinction between these two classes of estates is clearly and tersely stated by the court in Kelly v. McGuire as follows:

"It must be understood, however, that a new acquisition, in the sense intended by the statute, is one which the intestate has acquired by his exertions and industry or by will or deed from a stranger. In other words, it is an estate derived from any source other than descent, devise, or gift, from father or mother, or any relative in the paternal or maternal line. * * * Land is to be considered as having come from or by or on the part of the father or mother when it comes by gift, devise, or descent, either mediately or immediately from them or from any person in their respective line."

We find the title to these lands originally passing by patent from the United States to the Creek Nation or Tribe of Indians, a distinct community or political entity, having the right of local self-government, and long recognized as in a sense a state, although not a foreign state or state of the Union. Such was the condition of the Creek Nation at the time it received the patent for these lands, and such it continued to be at the time the laws and agreements now being considered were created. The patent from the United States to the Cherokee Nation conveys to that nation the same character of title to the lands that nation occupies as that conveyed by the patent to the Creek Nation. In reference to the Cherokee patent, the Supreme Court of the United States said, in Cherokee Nation v. Journeycake, 155 U. S. 196, 15 Sup. Ct. 55, 39 L. Ed. 120:

"By that patent, whatever of the title was conveyed was conveyed to the Cherokees as a nation, and no title was vested in severalty to the Cherokees or any of them."

Therefore no title in severalty is vested in any Creek citizen, and in no sense can the title to any allotment be said to have come to any allottee by or on the part of his mother or father. I see no reason why the individual members of the Creek Nation do not bear practically the same relation to the nation as a political entity as the individual citizens of the United States bear to the United States government, so far as a consideration of such relationship will throw light upon this question. The Supreme Court of Arkansas, in the case of Hogan v. Finley, 52 Ark. 55, 11 S. W. 1035, held that public land entered by a settler, and for which he received patent from the United States, became

in such settler's hands a "new acquisition," as the term is used in the Arkansas law we are now considering, saying:

"The land in controversy was a new acquisition by Thomas V. Taylor, and upon his death it passed first to his father and then to his mother for life."

If, then, the assumption is correct that the individual member of the Creek Nation stands in the same relation to that nation as the individual citizen of the United States does to that government, so far as the title to national or public lands is concerned, it seems clear that an allotment acquired by patent from the Creek Nation becomes as much a new acquisition as a homestead acquired by patent from the United States. It is true that Andrew J. Berryhill acquired his status as a Creek citizen by virtue of the Creek blood of his father; but, as suggested by defendant's counsel, in a great number of instances both the father and mother of the allottee are citizens by blood, and the allottee acquires his right through the blood of both equally. If we were to adopt this theory, and declare the estate ancestral, then, having come by both the father and the mother, each would be equally entitled to it in case of the allottee's death intestate, without descendants, and a condition would be presented not provided for by the law.

I therefore conclude that the allotment of Andrew J. Berryhill was, in contemplation of law, a new acquisition, and that his father, George Franklin Berryhill, acquired only a life estate. Having but a life estate, he could not execute a valid oil and gas lease thereon. "A tenant for life, of lands containing minerals, oil, or gas, cannot open any new mines or wells, or lease the lands to others for this purpose." 16 Cyc. 625; Marshall v. Mellon, 179 Pa. 371, 36 Atl. 201, 35 L. R. A. 816, 57 Am. St. Rep. 601; Gerkins v. Ky. Salt Co., 100 Ky. 734, 39 S. W. 444, 66 Am. St. Rep. 370; Hook v. Garfield Coal Co., 112 Iowa, 210, 83 N. W. 963. It follows that the lease relied upon by complainant, executed by George Franklin Berryhill, the life tenant, and Clementine Berryhill, his wife, who is conceded to have no title, is invalid, and conveys no interest to the complainant as against the defendants herein.

We now pass to the contention of the intervener that the land in controversy was not "inherited" land in the hands of George Franklin Berryhill, in the sense in which that term is used in Act April 26, 1906, c. 1876, 34 Stat. 137, removing restrictions from certain inherited lands of the Five Tribes. The act provides:

"Sec. 22. That the adult heirs of any deceased Indian of either of the Five Civilized Tribes, whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent."

Then follow certain provisions as to sales by full-bloods and minor heirs. If the term "inherited" is to be confined to its strict literal signification, it cannot apply to the land in controversy in this case, and the contention of the intervener must be sustained. As said in McArthur v. Scott, 113 U. S. 340, 5 Sup. Ct. 652, 28 L. Ed. 1015:

"The word 'inherited,' which is applied to real estate only, implies taking immediately from the testator as heirs take immediately from their ancestor, upon his death."

The act in which this provision is found is but one of a series of acts and agreements all having in view the abolishing of the tribal governments preparatory to statehood, and an equitable division of the lands and money of each tribe among its individual members. This act, therefore, must be read and construed, in connection with all the other acts and agreements relating to the same subject. Lewis' Sutherland, Stat. Construction, § 443. The reference to inherited lands in this act implies some law theretofore in existence providing for the descent of lands. As said in Starr v. Hamilton, Fed. Cas. No. 13,314:

"The term 'inheritance' is in legal parlance the exact equivalent of 'descent.'"

As applied to the Creek Nation, it has·reference to lands inherited under the terms of the original and supplemental agreements. The land in controversy passed by the terms of the supplemental agreement. The act of 1906 and the supplemental agreement must be construed together. We have decided that by the use of the term "descend" in the supplemental agreement it was intended that lands of a member dying before receiving his allotment should, in contemplation of law, descend to his heirs in all respects as though title to the allotment had vested in him before his death. If that be true, then in contemplation of law such lands become inherited lands in the hands of the heirs, and construing the act of 1906, as we must, in connection with the supplemental agreement, the term "inherited lands" must be held to apply as well to lands passing to heirs of members dying before allotment as to lands passing by technical descent from members dying after allotment I can conceive no reason why any distinction should be made between the two classes of lands referred to. The purpose of imposing restrictions in the first place was to protect a people presumably incompetent to deal with their own lands without some supervision. Congress has seen fit in this act to remove such restrictions from that class of lands termed "inherited land," subject to certain conditions as to full-bloods and minors, presumably considering that such measure of protection as Congress still deems necessary to afford the Indians can be exercised without longer imposing restrictions on this class of lands. But what possible reason could be suggested for continuing the restrictions on lands coming to the heirs as the land in controversy came to the intervener and removing them with reference to lands coming to heirs technically by descent? Certainly none can be suggested. If the act of 1906 stood alone, it might, with considerable force, be contended that its terms with reference to this matter are clear, and do not call for construction, and must, therefore, be literally construed. But this act, as we have seen, must be considered together with all other cognate acts. There being no reason for such a distinction, and no such distinction having been intended in the supplemental agreement, I conclude that the term "inherited lands," as applied to the Creek Nation, applies to all allotments selected by or for deceased members of the tribe, in the hands of their heirs, whether such deceased members died before or after receiving such allotments. It follows that by his deed to the McKays George Franklin Berryhill, the intervener, divested himself of all his title in the land in controversy.

Having decided that complainant's lessors had not such interest in the land as enabled them to make a valid oil and gas lease, and that the intervener's deed to the McKays divested him of all his title to the land, the other points raised at the trial become immaterial to a determination of this case.

A decree will be entered for the defendants, with costs taxed against the complainant and the intervener.