Booth, Chief Justice,
delivered the opinion of the court: Congress on May 20, 1924 (43 Stat. 133), passed an act, subsequently modified (44 Stat. 568), conferring jurisdiction on this court to adjudicate the claims of the Seminole Indians, both legal and equitable, arising out of treaties with the United States or acts of Congress passed in relation to their tribal affairs and property.
The petition of the Seminole Nation was filed March 21, 1930, and on December 15, 1931, the defendant filed a demurrer thereto. A decision upon the issue raised by the pleadings determines in all substantial respects the rights of the parties, and thereby emphasizes the importance of the controversy to both the plaintiff Indians and the United States. The allegations of the petition, aside from the usual and admitted averments as to tribal organization, etc., set forth an alleged liability of the Government predicated upon a violation of article 2 of the treaty entered into between the Seminóles and the United States on March 21, 1866 (14 Stat. 155, 756). This article we quote as follows:
“ARticle 2. The Seminole Nation covenant that henceforth in said nation slavery shall not exist, nor involuntary servitude except for and in punishment of crime, whereof the offending party shall first have been duly convicted in *457 accordance with, law, applicable to all the members of said nation. And inasmuch as there are among the Seminóles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color, who may be adopted as citizens or members of said tribe.”
The plaintiff alleges that notwithstanding the provisions of article 2 of the treaty of 1866 the defendant, as guardian or trustee of the Seminole Nation of Indians, did, under the provisions of two certain agreements known as the first Seminole agreement (30 Stat. 567) and the second or supplemental Seminole agreement (31 Stat. 250), divide and allot to at least 986 freedmen, former slaves of the Indians, a vast acreage of lands out of their communal property, and likewise distribute to them their pro rata share of the plaintiff’s Indian funds without authority and contrary to the provisions of the treaty quoted.
It is argued by the plaintiff that both under the treaty and the agreements authorizing allotments of its communal lands and distribution of its tribal funds, as well as the long-established and continuous governmental organization of the tribe itself, no one except full-blood Seminóles were entitled to participate therein, and that by every rule of construction, including the plain intent and purpose of the treaty, freedmen were excluded. To sustain this argument it is pointed out in the brief that the Seminole Tribe of Indians was composed of Seminóles by blood; that the Seminole Nation was made up of full-bloods and other individuals permitted to live among them, and that the Seminole national government was created wholly by the full-bloods for the administration of the nation’s affairs, and was devoid of authority to dispose of title to the communal estate of the tribe. From this statement the plaintiff deduces the conclusion that an important significance is to be attached to the words “ member ”, “ membership ”, “ citizen ”, and “ citizenship ”; that they are not synonymous, but, on the contrary, indicate that *458 a member when so designated is to be identified as a full-blood; a citizen as one included in the Seminole Nation and not the tribe. Therefore, when article 2 of the treaty used the words “shall have and enjoy all the rights of native citizens ”, the Indians intended to grant them no more than the political rights and immunities enjoyed by all the members of the Seminole Nation, intending to exclude them from any proprietary interest or title to their communal lands and tribal funds.
The single issue presented by the pleadings is not a new one. It is in fact no more than a continuation of a controversy that arose concerning other tribes when, under congressional legislation, the Government decided to allot the lands of the Five Civilized Tribes, of which plaintiff was one, in severalty, and distribute their tribal funds to them per capita. When the treaty of 1866 was made, the question of allotments in severalty was distant, lands were of comparatively little value, Indian reservations were set aside totalling vast acreages, and the question of the number of individuals composing the tribe was in no sense so important or acute as it subsequently became when the date of allotment arrived and the lands had materially increased in value.
We say this because the treaty involved is not only to be construed in the light of conditions obtaining in 1866 and not 1898 but also in view of the history of the Seminóles before and up to the date of its execution, keeping in mind the fundamental principles of law relating to the construction of Indian treaties.
The Seminole Indians, a name indicating “ wild wanderers or runaways ”, were originally a part of the Creek Tribe of Georgia, from which tribe they seceded, emigrating to Florida many years before the United States acquired Florida from Spain. They were undoubted owners of a considerable number of slaves, and, in addition to this, unquestionably harbored fugitive slaves escaping from their masters in Southern States and Cuba. History confirms the statement that the Negro population among the tribe was large, that intermarriage frequently occurred, and the Negroes were *459 botli in times of war and peace important and recognized allies of the Indians. In their ancient habitat the Seminóles were not averse to the presence of the Negro race among their tribe. The wife of Osceola, one of their most noted, ‘brave, and celebrated chiefs, was a descendant of a fugitive ■slave, and it was on account of her recapture as a fugitive that this intrepid half-breed chief waged a cruel and protracted warfare against the whites in which Negro troops participated to an important extent.
After Florida became a territory of the United States, the Government attempted by various treaties to remove the •Seminóles west of the Mississippi River to Arkansas. Many treaties were entered into with the tribe, providing homes :and lands for them within the Creek Reservation west, and many treaties were not only totally disregarded and Indian wars ensued but in no small measure the issue of the Indians’ -slaves entered into the situation, and it was not until 1845 that their removal was to any considerable extent accomplished, and as late as 1856 treaty inducements were offered to the Indians remaining in Florida to join their brethren in the West. The Indian slaves migrated with the tribe, ■ continued to bear the same relationship as from the beginning, and were an important constituency of its population. ' The Seminole Indians in Florida were not rich; their finan■cial status was not such as to warrant a belief that their ■slaves were bondsmen in the usually accepted relationship created 'by that term, and neither were they a tribe of great individual means when and after they emigrated to the West. As a matter of fact, the Indian and the Negro lived .side by side in the promotion of the nation’s enterprises and its material welfare.
When the Civil War came upon the country the Seminóles joined with the other tribes designated as the Five Civilized Tribes and entered into a treaty with the Confederacy. Its slave ownership was then somewhat extensive, and the tribe determined its course accordingly. After the war was over the tribe found itself under the necessity of negotiating new treaties with the United States, and this same condition obtained as to the other tribes similarly situated, and the treaty *460 of March 21, 1866, the one herein involved, in its preamble expressly recites that its designed purpose is to renew the relationship existing between the Indians and the United States interrupted and foreclosed by the acts of the Indians during the war.
What at this time, in view of the tribe’s long relationship with slavery, was the condition of affairs? The tribe’s slaves were freedmen; they had been for decades an integral part of the tribe, intermarriage occurred, and this body of freedmen were inhabitants of Indian country almost completely taken up by Indian reservations, with little, if any, opportunity to earn a living or accumulate property, and loath themselves to separate from an association of more than a generation of their race. There is nothing in contemporaneous history to indicate that the Indians were then averse to caring for their former slaves.
There is nothing in the whole history of the tribe that emphasizes the fact that the Indians were drawing or understood the technical distinctions between a member of and a citizen of the tribe. The treaty did not make the Indian slave a freedman. That was accomplished three years before the treaty was signed. It did not require a treaty to make an outsider a citizen of the tribe. This could be and was accomplished by the laws of the tribe’s government. What the treaty was dealing with in the main was property rights, the Indian title therein, and those upon which the same should be bestowed. It became essential to consider the character of the population of the tribe, and those residing within the reservation who would be entitled to share with others in the new reservation the rights heretofore recognized as attaching to full-bloods, and when it came to the freedmen the Indians agreed that they should “ enjoy all the rights and privileges of natives citizens.”
It is to be observed that the rights accorded the freedmen included equality not with an ordinary citizen of the tribe, an adopted member, but a native citizen, “ one who owes his domicile to the fact of his birth within the country referred to.” Language, it seems, could not more accurately define assimilated rights. It is true article 2 of the treaty did not use the language usually employed in an instrument of grant, *461 but this fact is obviously not controlling. Neither the Indians nor the United States are to be held strictly to technical terms used in Indian treaties. It is the intent of the parties which governs. Jones v. Meehan, 175 U.S. 1.
Article 2 is exclusively devoted to the question of slavery, and recites that the freedmen of the tribe “ have no interest or property in the soil, and no recognized civil rights ”, two rights which a native full-blood Indian possessed and all the rights anyone could have. As a matter of fact, nativity was a controlling factor when it came to interest or rights in Indian communal property, so that when the parties to the treaty considered the existing rights of the freedmen they first set out in express words that they possessed none, as their enumeration discloses, and thereafter they proceeded in the light of the related subject matter to grant them not one but all the rights of native citizens which slavery had withheld from them. No distinction was made as to rights in the soil or civil rights. Plaintiff would have the grant extend to civil rights only by a dependence upon the single word “ citizen ”, but obviously this is not the term used— it is “ native citizen ” — and we think a native citizen is one possessing all the rights of a native Indian. The freedmen were, as the article states, “ among the - Seminóles ”; they were then on the lands of the Indians where they and their ancestors had resided for many decades, as helpless and dependent upon the Indians as the latter were upon the Government and all parties to a treaty concerned as to their future welfare. To grant them no more than civil rights in a tribe on the eve of removal to a new reservation of its own, and they without means or resources equal to the Indians themselves, was to grant by words, what in effect was of little value in fact. The treaty was, we think, dealing with substantial rights to be accorded individuals, and not in technical terms. This is verified by article 4 of the treaty which is, in part, as follows:
“ The provisions of this article shall extend to and embrace the claims for losses sustained by loyal members of said tribe, irrespective of race or color; whether at the time of said losses the claimants shall have been in servitude or not; provided said claimants are made members of said tribe by the stipulations of this treaty.”
*462 The claims mentioned were subsequently paid to the extent of $186,000 (sec. 9 of the act of April 26, 1906, 34 Stat. 140).
Coincident with and directly akin to the consummation of the treaty of 1866 with the Seminóles, the Government was negotiating with the Creek, Choctaw, Chickasaw, and Cherokee Indian tribes negotiations upon precisely the same subject matter and made essential because these tribes, like the Seminóles, had made treaties with the Confederacy, and also owned slaves. What disposition was to be made of, and what rights were to be accorded the freedmen, were indispensable factors in reaching agreements. Let us see. The treaty with the Choctaws and Chickasaws was concluded on April 28,1866 (2 Kapp. 918), a few days over a month later than the Seminole Treaty. By art. 3 of this treaty the freedmen of the tribe were each granted an allotment of 40 acres of land out of the Indian reservation “ on the same terms as the Choctaws and Chickasaws ”, and were granted the option to accept one hundred dollars per capita if they elected to and did remove from the reservation within 90 days. This was not all. If the Indian tribes failed to observe the terms of the treaty, the freedmen were to become the beneficiaries of the sum paid to secure its execution, and receive from the United States such sums as the United States deemed sufficient to effect their removal within two years.
On June 14, 1866 (2 Kapp. 932), the Creeks, in a treaty concerning the rights of freedmen, provided for them by the following article:
“ART. 2. The Creeks hereby covenant and agree that henceforth neither slavery nor involuntary servitude, otherwise than in the punishment of crimes, whereof the parties shall have been duly convicted in accordance with laws applicable to all members of said tribe, shall ever exist in said nation; and inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is •stipulated that hereafter these persons lawfully residing in said Creek country under their laws and usages, or who have been thus residing in said country, and may return within one year from the ratification of this treaty, and their descendants and such others of the same race as may be permitted by the laws of the said nation to settle within the limits of the jurisdiction of the Creek Nation as citizens [thereof] shall have and enjoy all the rights and privileges *463 of native citizens, including an equal interest in the soil and national funds, and the laws of the said nation shall be equally binding upon and give equal protection to all such persons, and all others, of whatsoever race or color, who may be adopted as citizens or members of said tribe.”
True, it is a treaty covenant free from ambiguity, but in its purpose and intent similar to the obligations incurred by the Seminóles during this same period and with respect to the same people for whom both the Indians and the Government were solicitous.
On July 19, 1866, the Cherokees agreed, by article 9 of their treaty with the Government respecting the rights of freedmen, as follows (2 Kapp. 944) :
“ÁRT. 9. The Cherokee Nation having, voluntarily, in February, eighteen hundred and sixty-three, by an act of the national council, forever abolished slavery, hereby covenant and agree that never hereafter shall either slavery or involuntary servitude exist in their nation otherwise than in the punishment of crime, whereof the party shall have been duly convicted, in accordance with laws applicable to all the-members of said tribe alike. They further agree that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons, Avho were in the country at the commencement of the Kebel-lion, and are now residents therein, or who may return Avithin six months, and their descendants, shall have all the rights of native Cherokees: Provided, That owners of slaves so emancipated in the Cherokee Nation shall never receive any compensation or pay for the slaves so emancipated.”
This is the same treaty involved in the case of Whitmire, Trustee, v. Cherokee Nation, 30 C.Cls. 138, wherein it was held that the freedmen were entitled to share in the property of the tribe. Article 9 of this treaty in its provision is almost word for word similar to article 2 of the Seminole treaty of 1866.
In view of these contemporaneous and sequential events centered upon the same subject matter, dealing with the identical class of persons in pursuance of an Indian and governmental policy to deal justly with a large class of liberated people distant from their former southern homes, we think it impossible to ascribe to the Seminóles an intent and meaning to grant them no more than the slender privilege *464 of dwelling as an Indian citizen upon a reservation where Indian laws and regulations were in a large measure supreme, and opportunities for a livelihood decidedly circumscribed and the hazard of immediate loss of all they acquired by an allotment of the lands of the tribe. It is impossible to find in the history of the Seminóles a trace of hostility towards their slaves or freedmen. No such characteristic may be ascribed to the tribe until the final question of allotments arose, more than two decades after the execution of the treaty of 1866.
The plaintiff contends that the case of Whitmire, Trustee, v. Cherokee Nation, supra, is not controlling herein, and states in the brief that this court in the above case held that the freedmen did not acquire their rights under the treaty but under the constitution of the tribe. Whatever merit there may be in this contention, it is apparent from an analysis of the decision that the fundamental property rights of the freedmen originated in the grant conferred by article 9 of the treaty, and reference to the constitution of the tribe was made to disclose the meaning which the Indians themselves ascribed to the previous grant in the effect to be given thereto. In any event, the Supreme Court in the Oherohee Intermarriage eases (203 U.S. 76) did no more than confirm the principle that the grant of a right to participate in the property of the tribe is to be found in treaty stipulations. On page 87 the Court said:
“ The treaty of 1866, between the United States and the Cherokee Nation, provided as to the former slaves, that they should be free and they ‘ and their descendants shall have all the rights of native Cherokees.’ ”
In the Intermarriage eases just alluded to, the Supreme Court was not construing a treaty. The plaintiffs claimed property rights under Cherokee laws enacted in accord with legislative powers which the nation possessed. On page 88 of the opinion it is said:
“ The Delawares, the Shawnees, and the freedmen acquired their property rights by the express words of treaties, but the intermarried whites cannot point out any such in their favor. Doubtless because of this they have heretofore asserted no claim, although the Cherokee courts were open *465 to them to do so, and have allowed repeated payments of money to be made to every other citizen without question.”
The case is inapposite to the issue in this case, and if it has any bearing whatever, the decision refutes rather than confirms the contention of the plaintiff, for in the cases cited this court found and decreed that under Cherokee laws intermarried whites who had married Indian women prior to November 1, 1875, were entitled to share in the property of the tribe under the conditions set forth therein, and the decision was affirmed 'by the Supreme Court. This, we think, is a direct and positive ruling that the national government of the Indian tribe was clothed with jurisdiction to grant property rights in the property of the tribe. The Cherokees’ political organization was similar in all respects to the Semi-nóles’.
This case, unless it can be said that at the time the treaty was made, the Indians and the defendant were drawing up articles of agreement intended to be restricted in scope and effect to the technical meaning of membership and citizenship in an Indian tribe, and was so mutually understood, is governed in principle by the decision of this court in the Whit-mire ease, sufra, and the decision of the Supreme Court in Journeycake v. United States, 155 U.S. 196.
Beyond a doubt the governmental structure of the Semi-nóles recognized a distinction between civil and proprietary rights in the nation. However, it is clear from the cases involving similar governmental functions that when civil rights were to be granted, curtailed, or extinguished, the legislative authority of the nation acted, and that when property rights affecting title and distribution were involved in the matter of cessions of their reservations, treaties at this time were executed and ratified, and manifestly an Indian treaty was the supreme law. An examination of the Indian treaties made concurrently with the Seminole one discloses that these terms were not used in a technical sense but synonymously. The Supreme Court in the Journeycake case, supra, said, on page 212:
“ It is true that ‘ rights and immunities ’ are often used as descriptive of only political rights and immunities, and do not necessarily include property rights, so that if these were *466 the only words by which the intent of the contracting parties-was to be determined, there would be room for the argument that only political rights and immunities were intended to be granted. But it must be borne in mind that the rights and interest which the native Cherokees had in the reservation and outlet sprang solely from mtisenship in the Cherokee Nation, and that the grant of equal rights as members of the Cherokee Nation naturally carried with it the grant of all rights springing from citizenship.” [Italics inserted..^
An examination of the treaties made immediately after the close of the Civil War with the tribes who had entered into treaties with the Confederacy, unmistakably discloses that the predominant purpose and intent of the Government as to preexisting slavery was to protect and care- for the freedmen. Each tribe formerly possessed of slaves manifested no unwillingness to accede to this purpose, and each tribe agreed to positive articles in their treaties respecting the same subject matter. This is not all; the- verbiage of the articles by which the policy of the Government was accomplished, as the articles themselves disclose, used interchangeably and synonymously the words “ citizen ” and “ member.”
Conflicting arguments are advanced by plaintiff and defendant as to the legal consequences which flowed from the enactment of legislation concerning the allotment of the plaintiff’s lands and distribution of their funds, which makes-incumbent a review and discussion of this legislation as to its-scope and effect.
On March 3,1893 (27 Stat. 645), Congress inaugurated its-policy of extinguishing Indian tribal lands, allotting the-same in severalty among those entitled to receive them, and! distributing Indian tribal funds. A commission known as-the Dawes Commission was created, clothed with jurisdiction to enter into negotiations with the Five Civilized Tribes, of which the Seminóles were one, whereby the agreements might' be procured to accomplish the governmental purpose. This statute limited the authority of the Commission to negotiate-agreements and extended no further.
On June 10, 1896 (29 Stat. 321), the authority of the-Commission was extended and “ powers of an executive and quasi-judicial character ” were conferred. The Commission *467 was to hear and determine the applications of all persons who might apply for citizenship in the tribes and thereafter to make an enrollment of the citizenship of each tribe. Any person or tribe aggrieved over either the decision of the Commission or tribal authorities with respect to the matter of enrollment, possessed by the act the right of appeal to the •court of the territory invested with jurisdiction to hear and adjudicate what came to be known as, and were in fact, -citizenship. cases, and the court a citizenship court. Thereafter a number of such cases were reviewed and decided by •the court. The task of completing just Indian rolls of five Indian tribes was, as the Commission reported, a work of magnitude and importance, and during the progress thereof Congress enacted what is known as the Curtis Act (30 Stat. 495).
The Curtis Act is a detailed and comprehensive one, intended for the protection of the Indians. It contains a large number of paragraphs dealing with every phase of Indian rights and property brought about by the policy of the «Government, as heretofore noted. The act directs and authorizes the Commission to proceed “ to allot the exclusive use and occupancy of the surface of all the lands ” to the .Indians when the rolls of citizenship have been completed .as provided by law. Authority to make correct enrollment of the Indians was continued, and the rolls made by the ■Commission when approved by the Secretary of the Interior, were to become final. This we say because the following ■provision of the act discloses it (80 Stat. 503) :
“ Said Commission shall make such rolls descriptive of the persons thereon, so that they may be thereby identified, and it is authorized to take a census of each of said tribes, or to adopt any other means by them deemed necessary to enable them to make such rolls. They shall have access to all rolls and records of the several tribes, and the United States ■court in Indian Territory shall have jurisdiction to compel the officers of the tribal governments and custodians of such rolls and records to deliver same to said Commission, and •on their refusal or failure to do so to punish them as for contempt; as also to require all citizens of said tribes, and persons who should be so enrolled, to appear before said •Commission for enrollment, at such times and places as may .be fixed by said Commission, and to enforce obedience of *468 all others concerned, so far as the same may be necessary, to enable said Commission to make rolls as herein required, and to punish anyone who may in any manner or by any means obstruct said work.
“ The rolls so made, when approved by the Secretary of the Interior, shall be final, and the persons whose names are found thereon, with their descendants thereafter born to them, with such persons as may intermarry according to tribal laws, shall alone constitute the several tribes which they represent,”
a specific continuation and enlargement of the Commission’s original jurisdiction to correctly enroll the tribes.
Section 21 of the same act makes express provision for the enrollment of certain classes of Indians and others not Indians. As to the Cherokees, Creeks, Choctaws, and Chickasaws, certain rolls heretofore made applicable to said tribe are adopted and the enrollment of the freedmen of said tribes is provided for. A paragraph of said section reads as follows (30 Stat. 502) :
“ Said commission is authorized and directed to make correct rolls of the citizens by blood of all the other tribes, eliminating from the tribal rolls such names as may have been placed thereon by fraud or without authority of law, enrolling such only as may have lawful right thereto, * *
The plaintiff sedulously contends that the above paragraph was intended to and did limit the authority of the Commission, in enrolling Seminóles, to full-blood Indians and no other persons; and that the Commission in enrolling Seminole freedmen went beyond its jurisdiction. This argument is predicated upon the fact that section 21 of the act contains, no mention of the Seminóles by name, and that therefore they are necessarily embraced within the words “ correct rolls of the citizens by blood of all the other tribes.”
The contention is without merit. There is nothing in the language of the section that accomplishes more than a direction to the Commission to make a roll of full-blood Indians, and at the same time eliminate from existing full-blood rolls such persons who procured enrollment by fraud or were unlawfully thereon. Nowhere does it appear that Congress was intending to prohibit the Commission from enrolling persons who were entitled to be enrolled by law on a separate *469 roll though not of the full-blood. The Commission was engaged in making a roll “ of the citizenship of the several tribes as required by law.” The section is directory and points out what the Commission should do as to certain classes of persons.
The difficulties as to enrollment of the full-bloods resided only in proof as to ancestry, residence, etc. Nowhere and by no one was their eligibility questioned. The disputes and innumerable controversies encountered by the Commission resided in the task of a correct enrollment of those entitled to citizenship but not of the full-blood, and for these reasons the Commission was clothed with quasi-judicial power and the right of appeal to a court granted the applicants. Congress was well aware of the existing situation and was legislating in this paragraph with reference to a correct full-blood roll. The Dawes Commission possessed the authority to enroll the tribal Indians long prior to the passage of the Curtis Act.
That this is true is conclusively demonstrated by the express provisions of the Seminole agreement (30 Stat. 561) under and in pursuance of which the Seminole allotments were made. Section 21 does not mention the Seminole tribe by name, for concurrently with the consideration and passage of the Curtis Act the Commission was negotiating the Seminole agreement finally concluded July 1, 1898. This agreement executed by the parties, involving the allotment of their lands and distribution of their tribal funds, recites that the lands of the Seminóles shall be divided into three classes, and appraised when classified at the sums fixed in the agreement, thereafter “ shall be divided among the members of the tmbe so that each shall have an equal share thereof in value ”, etc.
The plaintiff says that “ members of the tribe ” are restricted to an enrollment of the full-bloods, because the Curtis Act and the agreement being in pari nnatemas, the authorization in the former to make a roll of full-bloods determines the meaning of the words “ members of the tribe.” It is difficult to follow this argument. The petition herein recites that the Indian tribe was made up of classes of persons. It is true certain classes possessed certain rights, but *470 obviously the population of the tribe when considered as a unit or individually were members of the same. The membership embraced all classes. There is nothing in the way of giving effect to both the Curtis Act and the agreement. The former directs a correct roll of full-bloods, and the latter authorizes allotments in accord with the Commission’s enrollment of persons as members of the tribe; and this is precisely what the Commission did. The full-bloods were enrolled upon one roll, and the freedmen upon a separate roll.
The second Seminole agreement (31 Stat. 250) confirms by express provisions what has just been said. This agreement, like the first one, received the approval of the Indians and was ratified by Congress on June 2, 1900. It provides in part as follows:
“ First. That the Commission to the Five Civilized Tribes, in making the rolls of Seminole citizens, pursuant to the act of Congress approved June twenty-eighth, eighteen hundred and ninety-eight, shall place on said rolls the names of all children born to Seminole citizens up to and including the thirty-first day of December, eighteen hundred and ninety-nine, and the names of all Seminole citizens then living; and the rolls so made, when approved by the Secretary or the Interior, as provided by said act of Congress, shall constitute the final rolls of Seminole citizens, upon which the allotment of lands and distribution of money and other property belonging to the Seminole Indians shall be made, and to no other persons.” [Italics inserted.]
If there was ever any congressional intention, which we do not think there was, to limit the Seminole rolls to members, meaning full-bloods, in previous legislation the above provision of the agreement discloses a positive and express reversal of the policy, and undoubtedly extends the roll to citizens. The lands are to be allotted in accord with a final roll of Seminole citizens and no other persons. The plaintiff admits that a full-blood is a citizen and likewise concedes that others with no such ancestry are also citizens.
This provision of the agreement signally illustrates the futility of construing the treaty of 1866, or the acts of Congress cited, upon the technical basis of an intended distinc *471 tion between citizens and members of tbis tribe. The word “ citizens ” appears in the agreement three times, the words “ Seminole citizens ” once, and the word “ member ” once. That the agreement constituted an express consent of the Indians to abide by the allotments of the Commission is, we think, too plain for argument, and ought of itself to determine the issue in this case.
This is not all, however, for Congress on April 26, 1906 (84 Stat. 131), passed an act, of which the following is a part:
“ That after the approval of this act no person shall be enrolled as a citizen or freedman of the Choctaw, Chickasaw, Cherokee, Creek, or Seminole Tribes of Indians in the Indian Territory, except as herein otherwise provided, unless application for enrollment was made prior to December first, nineteen hundred and five, and the records in charge of the Commissioner to the Five Civilized Tribes shall be conclusive evidence as to the fact of such application; and no motion to reopen or reconsider any citizenship case, in any of said tribes, shall be entertained unless filed with the Commissioner to the Five Civilized Tribes within sixty days after the date of the order or decision sought to be reconsidered except as to decisions made prior to the passage of this act, in which cases such motion shall be made within sixty days after the passage of this act: * *
The word “ member ” is not used in the act.
On May 21, 1908 (35 Stat. 312), Congress, by section 3 of an act passed to remove restrictions from part of the lands previously allotted to the tribes, provided as follows, p. 313:
“That the rolls of citizenship and of freedmen of the Five Civilized Tribes approved by the Secretary of the Interior shall be conclusive evidence as to the quantum of Indian blood of any enrolled citizen or freedman of said tribes and of no other persons to determine questions arising under this act and the enrollment records of the Commissioner to the Five Civilized Tribes shall hereafter be conclusive evidence as to the age of said citizen or freedman.”
The preliminary roll of Seminóles by blood and Seminole freedmen was completed by the Dawes Commission in 1899. Separate rolls were made as to Seminóles by blood and Seminole freedmen. In the report of the Commission to the Sec *472 retary of the Interior (1899, p. 12) the duty imposed, among many others, is expressly said to be the enrollment of “ Sem-inóles, Indians, and freedmen ”, and this is followed by the statement:
“ The Seminóles, as has already been seen, are the fewest in numbers of the Five Tribes, and their government has been free from corruption. The rolls of the tribe, while crude in a measure, were found free from all irregularities of a fraudulent character. The chief difficulties experienced by the Commission in their enrollment arose from the fact that very few well-established family names exist, and applicants were not always able to give such information regarding parentage, relationship, etc., as is necessary to make ‘ rolls descriptive of the persons thereon ’, and from the further fact that very few of the Seminóles speak English. Intermarriage with a citizen of the Seminole Nation does not confer citizenship on the noncitizen so intermarrying, and there are therefore no intermarried citizens to be enrolled in that nation. Indeed, it is essentially a nation of full-bloods, save as to its colored citizens, who, under treaty provision, are on an equal footing with the citizens by blood. About one third of the citizens of the Seminole Nation are freedmen, and while the law does not specifically require a separate roll of each of these classes, the Commission’s data will enable it to so separate them. The preliminary .roll of the Seminóles has been completed, but as no date has yet been fixed after which children born to citizens shall not be added the roll cannot be closed.” [Italics inserted.]
The rolls thus made were approved by the act of March 3, 1905 (33 Stat. 1048,1071), except an authorization to extend them as follows: “ That the Commission to the Five Civilized Tribes is authorized for ninety days after the date of the approval of this Act to receive and consider applications for enrollment of infant children born prior to March fourth, nineteen hundred and five, and living on said latter date, to citizens of the Seminole tribe whose enrollment has been approved by the Secretary of the Interior; and to enroll and make allotments to such children giving to each an equal number of acres of land, and such children shall also share equally with other citizens of the Seminole tribe in the distribution of all other tribal property and funds,” and the lands were allotted and the tribal funds distributed in ac *473 cord with the final rolls of the Commission and the laws of Congress. A laborious review of the reports of the Commission and the Secretary of the Interior fails to disclose that either the Seminole tribe or individual full-bloods contended before the Commission or the Indian courts of the territory that Seminole freedmen were not entitled to enrollment under the treaty of 1866.
We have gone into this tedious discussion of all the foregoing legislation because, as previously observed, it has been cited in the briefs of counsel in conflicting arguments advanced as to its bearing upon the issue involved. Assuredly it cannot be said that Congress in the various acts cited intended to recognize what is herein claimed, a technical distinction and restricted application of the rights of Indians upon the basis of the use of the words citizen and member of a tribe. Taken as a whole, it reflects a congressional intent to carry into execution the express purpose of the Government in extinguishing prevailing Indian title to lands, distribute their tribal funds, and by a gradual process set aside the original tribal organizations in the hope of creating a new and more beneficial relationship between the Indians and the Government, and nowhere in all this legislation may it be found that Congress did aught else by its terms than to approve and ratify what its created commission and the Secretary of the Interior were authorized to do. The congressional intent was to wind up and conclude the proceedings incident to the Government’s general purpose.
The rights which the Seminole freedmen acquired under the treaty of 1866 were the rights of “ native citizens.” The Indians knew what the rights of a native citizen were, they said so in the clause of the treaty, i.e., “ rights in the soil and civil rights ”, and these rights were, we think, the' ones granted to their former slaves.
The demurrer is sustained and the petition dismissed. It is so ordered.
Whalet, Judge; Williams, Judge; and Gkeen, Judge, concur.
Littleton, Judge, dissents.